IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
(Southern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and, | ) | |
| the STATE OF TENNESSEE, *ex. rel.* | ) | |
| ROBERT E. COOPER, in his representative | ) | |
| capacity as the Attorney General and | ) | |
| Reporter of Tennessee, | ) | |
| Plaintiffs, | ) | Case: No. 1:12-cv-00245  Collier/Lee |
| | ) | |
| v. | ) | |
| | ) | <u>CONSENT DECREE</u> |
| THE CITY OF CHATTANOOGA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | Consolidated with |
| TENNESSEE CLEAN WATER | ) | |
| NETWORK, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:10-CV-281 |
| v. | ) | Collier/Lee |
| | ) | |
| CITY OF CHATTANOOGA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

I.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  OBJECTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.  REVIEW OF DELIVERABLES/CERTIFICATION OF DELIVERABALES . . . 18

VI.  COMPLIANCE REQUIRMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  CIVIL PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECT. . . . . . . . . . . . . . . . . . 65

IX.  REPORTING REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

X.  STIPULATED PENALTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

XI.  FORCE MAJEURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

XII.  DISPUTE RESOLUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

XIII.  RIGHT OF ENTRY AND INFORMATION COLLECTION
        AND RETENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

XIV.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS. . . . . . . . . . . . 85

XV.  COSTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

XVI.  NOTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

XVII.  EFFECTIVE DATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XVIII.  RETENTION OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XIX.  MODIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

-ii-

**XX. TERMINATION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **91**

**XXI. PUBLIC PARTICIPATION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **92**

**XXII. SIGNATORIES/SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **93**

**XXIII. INTEGRATION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **93**

**XXIV. FINAL JUDGMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**

**XXV. APPENDICES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**

WHEREAS, Plaintiff, the United States of America ("United States"), by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint (the "Complaint") concurrently with the lodging of this Consent Decree alleging that Defendant, the City of Chattanooga, Tennessee ("Chattanooga"), has violated and will continue to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311 ("CWA"), and terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") permit issued under Section 402 of the CWA, 33 U.S.C. § 1342;

WHEREAS, Plaintiff, the State of Tennessee ("State"), acting at the request of the Tennessee Department of Environment and Conservation ("TDEC"), joined in the Complaint and seeks injunctive relief and civil penalties for Chattanooga's alleged violations of the Tennessee Water Quality Control Act ("TWQCA"), Tenn. Code Ann. §§ 69-3-101 *et seq.*, and the regulations promulgated pursuant thereto;

WHEREAS, TDEC has been authorized by EPA to administer the NPDES program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b);

WHEREAS, the State is also a plaintiff in this action and is joined as a party under Section 309(e) of the CWA, 33 U.S.C. § 1319(e), which requires the state in which a municipality is located to be joined as a party whenever the municipality is a party to a civil action brought by the United States under Section 309 of the CWA;

WHEREAS, on October 13, 2010, Plaintiff, the Tennessee Clean Water Network ("TCWN"), filed a complaint against Chattanooga, Civil Action No. 1:10-CV-281 Collier/Lee (USDC E.D. TN), alleging CWA violations, including unauthorized discharges from the West Bank and East Bank Outfalls, sanitary sewer overflows ("SSO"), combined sewer overflows ("CSOs") during dry weather, exceedances of E. coli limits in the discharge from the Moccasin Bend Wastewater Treatment Plant, and failure to properly measure and report the volume of SSOs (the "TCWN Complaint");

WHEREAS, Chattanooga disputes the allegations set forth in the TCWN Complaint;

WHEREAS, by Agreed Order entered January 20, 2011, the lawsuit between the TCWN and Chattanooga was stayed for a period of one hundred eighty (180) days;

WHEREAS, by an Agreed Order entered September 12, 2011, the lawsuit between the TCWN and Chattanooga was stayed for an additional period of one hundred eighty (180) days;

WHEREAS, by an Agreed Order entered January 18, 2012, the lawsuit between the TCWN and Chattanooga was stayed for an additional period of one hundred eighty (180) days;

WHEREAS, by stipulation filed by the Parties as of the date of the filing of this Consent Decree, the Parties requested that the United States' and the State's Complaint be consolidated with the TCWN Complaint;

WHEREAS, Chattanooga is a "municipality" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362;

WHEREAS, Chattanooga owns and operates municipal wastewater collection, retention and transmission systems ("WCTS") that consists of a separate sanitary sewer system ("SSS") and a combined sewer system ("CSS") and that are designed to collect and convey municipal sewage (domestic, commercial and industrial) to its Moccasin Bend Wastewater Treatment Plant (the "WWTP") and to its eight (8) permitted CSO outfalls pursuant to NPDES Permit Number TN0024210 (the "NPDES Permit") issued to Chattanooga by TDEC;

WHEREAS, Chattanooga has reported to EPA and TDEC numerous SSOs of sewage from its WCTS since October 13, 2005, including a number of SSOs from unpermitted outfalls known as the East Bank Outfall and West Bank Outfall;

WHEREAS, Chattanooga has reported to EPA and TDEC that it had discharges of sewage during dry weather from its permitted CSO outfalls on a number of occasions since October 13, 2005;

WHEREAS, Chattanooga has reported that it discharged wastewater from its permitted CSO outfalls without receiving full primary treatment on several occasions since October 13, 2005;

WHEREAS, Chattanooga has reported to EPA and TDEC that it has failed to consistently monitor for all parameters specified in its NPDES Permit and has reported a number of exceedances of the effluent limitations in the NPDES Permit since October 13, 2005;

WHEREAS, the United States, the State, and the TCWN contend that these SSOs, dry weather and untreated discharges from the CSO outfalls, failures to consistently monitor water

-5-

quality, and effluent limit exceedances are violations of the CWA, the TWQCA, and the NPDES Permit;

WHEREAS, Plaintiffs contend that Chattanooga must provide an updated Long Term Control Plan to ensure that its CSO discharges and its WWTP discharges fully comply with EPA's 1994 *Combined Sewer Overflow (CSO) Control Policy*, 59 Fed. Reg. 18688 (the "CSO Control Policy");

WHEREAS, this Consent Decree requires Chattanooga to develop, submit, finalize, and implement plans for the continued improvement of its WCTS and WWTP to eliminate SSOs, to eliminate dry weather and untreated CSOs, to establish consistent water quality monitoring, to correct effluent limit violations, and to ensure compliance with the CSO Control Policy;

WHEREAS, the Parties to this Consent Decree have negotiated in good faith and have reached a settlement of the issues raised in the Complaint and the TCWN Complaint;

WHEREAS, Chattanooga's agreement to this Consent Decree is not an admission of liability and, except for Chattanooga's consent to jurisdiction and venue as provided in Section I of this Consent Decree, this Consent Decree is not an adjudication or admission of any fact or law;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest;

NOW THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I.  **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 309(b) and 505 of the CWA, 33 U.S.C. §§ 1319(b) and 1365, and over the Parties.  This Court has supplemental jurisdiction over the state law claims asserted by the State pursuant to 28 U.S.C. § 1367.  Venue is proper in the Eastern District of Tennessee pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint and the TCWN Complaint are alleged to have occurred in this judicial district.  For purposes of this Consent Decree, or any action to enforce this Consent Decree, Chattanooga consents to the Court's jurisdiction over this Consent Decree and any such action and over Chattanooga and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Chattanooga agrees that the Complaint states claims upon which relief may be granted pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and the TWQCA, Tenn. Code Ann. §§ 69-3-101 *et seq.*  For purposes of this Consent Decree, Chattanooga agrees that the TCWN Complaint states claims upon which relief may be granted pursuant to Section 309(b) and 505(a)(1) of the CWA, 33 U.S.C. §§ 1319(b) & 1365(a)(1).

## II. APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States, the State, the TCWN, and upon Chattanooga and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Sewer System, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Chattanooga of its

-7-

obligation to ensure that the terms of this Consent Decree are implemented with respect to any of the other remaining portions of the Sewer System that are owned or operated by Chattanooga. Within twenty-one (21) Days prior to such transfer, Chattanooga shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the United States and TDEC in accordance with Section XVI of this Consent Decree (Notices). Chattanooga shall require, as a condition of any sale or transfer, that the purchaser or transferee agrees in writing to be bound by this Consent Decree and submit to the jurisdiction of the Court for its enforcement. Provided, however, that Chattanooga may transfer within any twelve (12) Month period, an ownership interest, operation, management, or other control of portions of the WCTS of up to one hundred (100) residential customer accounts, or the volumetric equivalent thereof, without this Paragraph applying to the successor and/or assigns who takes ownership or control of such portions of the WCTS from Chattanooga. Any attempt to transfer ownership or operation of the Sewer System without complying with this Paragraph constitutes a violation of this Consent Decree.

5.      Within thirty (30) Days after the Effective Date of the Consent Decree, Chattanooga shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any substantive provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.

6.     In any action to enforce this Consent Decree, Chattanooga shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. OBJECTIVES

7.     All plans, measures, reports, construction, maintenance, operational requirements, and other obligations in this Consent Decree or resulting from the activities required by this Consent Decree shall have the objective of causing Chattanooga to achieve and maintain full compliance with the CWA, the TWQCA, the CSO Control Policy and the NPDES Permit, including the goal of eliminating all SSOs.

### IV. DEFINITIONS

8.     Terms used in this Consent Decree that are defined in the CWA or in regulations promulgated pursuant to the CWA shall have the meanings assigned to them in the CWA, 33 U.S.C. §§ 1251 *et seq*., and regulations promulgated under the CWA, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

(a).     "Building Backup" shall mean a wastewater release or backup into a building that is caused by blockages, flow conditions, or other malfunctions in Chattanooga's WCTS.  A wastewater backup or release that is caused by blockages, flow conditions, or other malfunctions of a Private Lateral is not a Building Backup.

(b).     "Bypass" shall have the meaning set forth at 40 C.F.R. § 122.41(m).

(c).    "Calendar Quarter" shall mean the three (3) month periods ending on March 31, June 30, September 30, and December 31.

(d).    "Calendar Year" shall mean the twelve (12) month period starting on January 1 and ending on December 31.

(e).    "Certification" or "Certify" when used in this Consent Decree shall require Chattanooga to comply with Paragraph 17 of this Consent Decree.

(f).    "Chattanooga" shall mean the City of Chattanooga, Tennessee, including all of its departments, agencies, instrumentalities such as the Public Works Department, and any successor thereto.

(g).    "CMOM" or "Capacity, Management, Operations, and Maintenance" shall mean a flexible program of accepted industry practices to properly manage, operate and maintain sanitary wastewater collection, transmission and treatment systems, investigate capacity-constrained areas of these systems, and respond to SSO events.

(h).    "Combined Sewer Overflow" or "CSO" shall mean any discharge from the CSS from any outfall currently identified, or identified in the future, as a permitted combined sewer overflow outfall in any Chattanooga NPDES permit.

(i).    "Combined Sewer Overflow Outfall" or "CSO Outfall" shall mean the outfalls currently identified, or identified in the future, as a permitted combined sewer overflow outfall in any Chattanooga NPDES permit from which CSOs are discharged to waters of the United States or the State.

(j).    "Combined Sewer System" or "CSS" shall mean the portion of Chattanooga's WCTS designed to convey municipal sewage (domestic, commercial and

-10-

industrial wastewaters) and stormwater runoff through a single-pipe system to Chattanooga's WWTP or CSO Outfalls.

(k). "Complaint" shall mean the complaint filed by the United States and the State in this action.

(l). "Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXV). In the event of a conflict between this document and any appendix, this document shall control.

(m). "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251, *et seq.*

(n). "Date of Entry" shall mean the date on which this Consent Decree is entered by the United States District Court for the Eastern District of Tennessee.

(o). "Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Eastern District of Tennessee.

(p). "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

(q). "Defendant" shall mean the City of Chattanooga, Tennessee including all of its departments, agencies, instrumentalities such as the Public Works Department, and any successor thereto.

-11-

(r).     "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of Chattanooga pursuant to this Consent Decree.

(s).      "Discharge Monitoring Report" or "DMR" is defined as the monitoring report which Chattanooga submits to TDEC on a monthly basis pursuant to its NPDES Permit.

(t).     "DOJ" shall mean the United States Department of Justice and any of its successor departments or agencies.

(u).     "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

(v).     "Effective Date" shall have the definition provided in Section XVII (Effective Date).

(w).     "Excessive Inflow / Infiltration" or "Excessive I/I" shall have the meaning provided in 40 C.F.R. § 35.2005(b)(16).

(x).     "Force Main" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a Pump Station.  A Force Main is intended to convey wastewater under pressure.

(y).     "Gravity Sewer Line" or "Gravity Sewer" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity.

(z).     "Infiltration" as defined by 40 C.F.R. § 35.2005(b)(20) shall mean water other than wastewater that enters the WCTS (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes.

-12-

(aa).    "Inflow" as defined by 40 C.F.R. § 35.2005(b)(21) shall mean water other than wastewater that enters the WCTS (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage.

(bb).    "I/I" shall mean the total quantity of water from inflow, infiltration, and rainfall induced inflow and infiltration without distinguishing the source.

(cc).    "Major Gravity Line" shall mean any of the following:

i.    All Gravity Sewer Lines that are twelve (12) inches in diameter or larger;

ii.    All Gravity Sewer Lines that convey wastewater from one pumping station service area to another pumping station service area; and

iii.    All Gravity Sewer Lines that have caused or contributed to, or that Chattanooga knows will likely cause or contribute to, a capacity-related SSO.

(dd).    "Month" shall mean shall mean one calendar month running from the numbered day to the same numbered day of the following calendar month, regardless of whether the particular month has 28, 29, 30 or 31 days.  In the case where a triggered event would occur on a day of the month which does not exist (for example, on February 30), then the event shall be due on the first (1st) day of the following month (for example, March 1).

(ee).    "NPDES" shall mean the National Pollutant Discharge Elimination System authorized under Section 402 of the CWA, 33 U.S.C. § 1342.

-13-

(ff).    "NPDES Permit" shall mean NPDES permit No. TN0024210 issued to

Chattanooga pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for the

Moccasin Bend WWTP, and any future extended, modified, or reissued permits.

(gg).    "Paragraph" shall mean a portion of this Consent Decree identified by an

Arabic numeral.

(hh).    "Parties" shall mean the United States of America on behalf of EPA, the

State on behalf of TDEC, the TCWN, and Chattanooga.

(ii).    "Plaintiffs" shall mean the United States of America on behalf of EPA, the

State of Tennessee on behalf of TDEC, and the TCWN.

(jj).    "Private Lateral" shall mean that portion of a sanitary sewer conveyance

pipe that extends from the wastewater main to the single-family, multi-family, apartment, or

other dwelling unit or commercial or industrial structure to which wastewater service is or has

been provided.

(kk).    "Prohibited Bypass" shall mean the intentional diversion of waste streams

from any portion of a treatment facility which is prohibited pursuant to the terms set forth at 40

C.F.R. § 122.41(m).

(ll).    "Public Document Repository" or "PDR" shall mean the Downtown

Branch of the Chattanooga City Library, located at 1001 Broad Street, Chattanooga, TN 37402,

and such repository that Chattanooga shall make available via the internet, including through its

website, www.chattanooga.gov.

(mm).  "Pump Station" shall mean facilities owned or operated by Chattanooga

that are comprised of pumps which lift wastewater to a higher hydraulic elevation, including all

related electrical, mechanical, and structural systems necessary to the operation of that pump station; provided, however, this definition shall not include any residential grinder pumps.

(nn).    "Sanitary Sewer Overflow" or "SSO" shall mean any discharge of wastewater to waters of the United States or the State from Chattanooga's Sewer System through a point source not permitted in any NPDES permit, as well as any overflow, spill, or release of wastewater to public or private property from the Sewer System that may not have reached waters of the United States or the State, including all Building Backups.

(oo).    "Sanitary Sewer System" or "SSS" shall mean the portion of Chattanooga's WCTS designed to convey only municipal sewage (domestic, commercial and industrial wastewaters) to Chattanooga's WWTP.

(pp).    "Secondary Treatment" shall mean a biological wastewater treatment technology required by the CWA for discharges from Publicly Owned Treatment Works, as that term is defined at 40 C.F.R. § 403.3(q).  The minimum level of effluent quality attainable through the application of secondary treatment is established in 40 C.F.R. § 133.102 in terms of the parameters for 5-day biochemical oxygen demand ("$BOD_5$") concentration and percent removal, total suspended solids ("TSS") concentration and percent removal, and pH.

(qq).    "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

(rr).    "Sewershed" shall mean all portions of Chattanooga's WCTS that are a tributary to a trunk sewer entering the WWTP.  Each Sewershed is hydraulically linked and independent of other Sewersheds, unless otherwise noted.  A map of Chattanooga's Sewersheds is attached hereto as Appendix A.

-15-

(ss). "Sewer System" shall mean the WCTS and the WWTP.

(tt). "State" shall mean the State of Tennessee including all of its departments, agencies, and instrumentalities, and any successor departments, agencies, and instrumentalities.

(uu). "Subparagraph" shall mean a portion of a paragraph identified by lowercase letters.

(vv). "TCWN" shall mean the Tennessee Clean Water Network.

(ww). "TCWN Complaint" shall mean the complaint filed by the TCWN against the City of Chattanooga on October 13, 2010, Civil No. 1:10-CV-281 Collier/Lee (USDC E.D. TN).

(xx). "TDEC" shall mean the Tennessee Department of Environment and Conservation and any successor departments or agencies of the State, and any successor departments or agencies.

(yy). "Timely" when applied to the submittal of a Deliverable shall mean submitted no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and containing all of the elements pertaining to the submittal as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree). "Timely," when applied to the implementation of any Work shall mean implemented no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and in accordance with the elements pertaining to such Work as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).

(zz). "TWQCA" shall mean the Tennessee Water Quality Control Act, Tenn. Code Ann. §§ 69-3-101, *et seq.*

(aaa).  "United States" shall mean the United States of America, acting on behalf of EPA, including its departments, agencies, and instrumentalities, and any successor departments, agencies, and instrumentalities.

(bbb).  "Wastewater Collection and Transmission System" or "WCTS" shall mean the wastewater collection, retention, and transmission systems, including all pipes, Force Mains, Gravity Sewer Lines, lift stations, Pump Stations, manholes and appurtenances thereto, owned or operated by Chattanooga that are designed to collect and convey municipal sewage (domestic, commercial and industrial) to Chattanooga's WWTP or CSOs.  The WCTS is comprised of the SSS and CSS.

(ccc).  "Wastewater Treatment Plant" or "WWTP" shall mean devices or systems used in the storage, treatment, recycling, and reclamation of municipal wastewater at the Moccasin Bend WWTP located at 455 Moccasin Bend Road, Chattanooga, TN 37405-4403.

(ddd).  "Work" shall mean all activities Chattanooga is required to perform under this Consent Decree.

## V.   REVIEW, APPROVAL AND IMPLEMENTATION OF DELIVERABLES

9.    Public Document Repository.

(a)    Except as otherwise set forth in Paragraphs 9-10, prior to the submission of a Deliverable to EPA and TDEC pursuant to Section VI and VIII of this Consent Decree, Chattanooga shall provide notice of a draft Deliverable in the PDR for review and comment by the public by taking the following steps:

(i).    Notify the Reference Librarian at the downtown branch of the Chattanooga-Hamilton County Public Library (located at 1001 Broad Street in downtown

Chattanooga) identifying the Deliverable to be submitted and provide the Reference Librarian with a copy of the draft deliverable and a one-page instruction form containing a brief synopsis of the Deliverable.

(ii).     Post a copy of the Deliverable and the instruction form containing a brief synopsis of the Deliverable on Chattanooga's website.

(iii).     Allow the public a period of thirty (30) Days to inspect and comment to Chattanooga on the Deliverable, either at the library or through Chattanooga's website ("Public Review Requirement").

(b).     Following the end of the Public Review Requirement, Chattanooga shall consider any public comments received for a period of up to fifteen (15) Days ("Public Comment Review Period").   Following the end of the Public Comment Review Period, Chattanooga shall submit the Deliverable to EPA and TDEC and provide notice to TCWN.  Within seven (7) Days after its submission to EPA and TDEC, Chattanooga shall place a copy of the submitted version of the Deliverable in the PDR.  Within seven (7) Days after EPA's approval, approval upon conditions, or modification by EPA pursuant to this Section, if revised, Chattanooga shall place a copy of such version of the Deliverable in the PDR.  All of the documents referenced above shall remain in the PDR along with all comments until termination of this Consent Decree.  However, if Chattanooga resubmits a Deliverable to EPA in response to EPA comments pursuant to Paragraph 12, such resubmission is not subject to the thirty (30) Day public comment period nor is Chattanooga required to obtain public comment on the resubmission.

10.     <u>EPA Action on Deliverables</u>.  After review of any Deliverable that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with TDEC, shall in writing:

(a).     Approve the submission;

(b).     Approve part of the submission and disapprove the remainder; or

(c).     Disapprove the submission.

11.     <u>Approved Deliverables</u>.  If a Deliverable is approved by EPA pursuant to Subparagraph 10.(a)., Chattanooga shall take all actions required by the Deliverable in accordance with the schedules and requirements of the Deliverable as approved.  If the Deliverable is approved only in part pursuant to Subparagraph 10.(b)., Chattanooga shall, upon written direction from EPA, after consultation with TDEC, take all actions required by the approved plan, report, or other item that EPA, after consultation with TDEC, determines are technically severable from any disapproved portions, subject to Chattanooga's right to dispute only the specified conditions or the disapproved portions under Section XII of this Consent Decree (Dispute Resolution).  Following EPA approval of any Deliverable or portion thereof, such Deliverable or portion thereof so approved shall be incorporated into and become enforceable under this Consent Decree.

12.     <u>Disapproved Deliverables</u>.  If the Deliverable is disapproved in whole or in part pursuant to Subparagraph 10.(b). or (c)., subject to Chattanooga's right to dispute only the specified conditions or the disapproved portions under Section XII of this Consent Decree (Dispute Resolution), Chattanooga shall, within thirty (30) Days or such other time as EPA and Chattanooga agree to in writing, correct all deficiencies and resubmit to EPA the Deliverable, or

disapproved portion thereof, for approval, in accordance with Paragraphs 10 and 11. If the resubmission is approved in whole or in part, Chattanooga shall proceed in accordance with Paragraph 11.

13. <u>Stipulated Penalties Accruing</u>. Subject to Chattanooga's right to dispute only the specified conditions or the disapproved portions under Section XII of this Consent Decree (Dispute Resolution), any stipulated penalties applicable to the original Deliverable, as provided in Section X of this Consent Decree, shall accrue during the thirty (30)-Day period or other specified period, but shall not be payable unless the resubmitted Deliverable is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Chattanooga's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

14. <u>Resubmitted Deliverable</u>. If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA, after consultation with TDEC, may again require Chattanooga to correct any deficiencies, in accordance with Paragraph 12, or may itself correct any deficiencies, subject to Chattanooga's right to invoke Dispute Resolution under Section XII of this Consent Decree and the right of EPA to seek stipulated penalties as provided in preceding Paragraph 13. Upon EPA's correction of any deficiencies, such resubmitted plan, report, or other item, or portion thereof will be incorporated into and become enforceable under this Consent Decree and shall be implemented by Chattanooga according to the approved schedule subject to Chattanooga's right to invoke Dispute Resolution.

-20-

15.     Timing of Review of Deliverables.  EPA and TDEC agree to use best efforts to expeditiously review and comment on Deliverables.  If EPA issues written comments and decisions on a Deliverable required in Paragraphs 21, 23 or 24 more than one-hundred twenty (120) Days after receipt of such submission, or on any other Deliverable more than sixty (60) Days after receipt of such submission, any subsequent deadline or milestone that is dependent upon such comments or decisions shall be extended.  The length of the extension shall be determined by calculating the number of Days between EPA's receipt of the submission and the date of EPA's written response, less one-hundred twenty (120) Days (in case of a Deliverable required in Paragraphs 21, 23 or 24) or less sixty (60) Days (in case of any other Deliverable).  Within thirty (30) Days of the date that Chattanooga knows or should know of a deadline or milestone that Chattanooga believes is extended under this Paragraph, Chattanooga shall inform EPA, in writing, of its belief and the amount of time Chattanooga believes the deadlines or milestones are extended.  If EPA disagrees with Chattanooga's determination that a deadline is dependent upon such comments or decisions, EPA shall inform Chattanooga in writing.  Chattanooga may dispute EPA's conclusion regarding whether a deadline is dependent upon such comments or decisions pursuant to Section XII (Dispute Resolution).

16.     Revisions to Deliverables.  The Parties recognize that Chattanooga may need or want to revise certain Deliverables during the term of this Consent Decree.  Such revisions shall not be considered modifications to the Consent Decree for purposes of Section XXI (Modification).  Chattanooga must obtain EPA's prior written approval of any revision to the substance of a Deliverable and shall place copies of any such revised Deliverable in the PDR in accordance with the provisions of Paragraph 9.  Chattanooga may revise the form of any

-21-

Deliverable without consulting EPA and shall place a copy of any such revised Deliverable in the PDR within seven (7) Days after making such revision.

17.     Certification.   In all Deliverables, notices, documents, or reports required to be submitted to the United States and State pursuant to this Consent Decree, Chattanooga shall, pursuant to 40 C.F.R. § 122.22, sign and certify such notices, documents, and reports as follows:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

## VI.  COMPLIANCE REQUIREMENTS

18.     Obligation to Perform Work.   Upon the Date of Entry, Chattanooga shall implement the Work pursuant to this Consent Decree.  All Work shall be performed using sound engineering practices, which may include appropriate provisions of the *Handbook: Sewer System Infrastructure Analysis and Rehabilitation*, EPA/625/6-91/030, 1991; *Existing Sewer Evaluation and Rehabilitation*, WEF MOP FD-6, 1994; and the *Tennessee Design Criteria for Sewage Works* in accordance with Tenn. Comp. R. & Regs., ch. 1200-4-2-.03.

19.    <u>Community Input</u>.  Pursuant to Section 31-57(a) of the Chattanooga City Code, the City has established a seven (7)-member Wastewater Regulations and Appeals Board (the "Board"), consisting of the following:  one (1) environmental engineer or environmental scientist; one (1) attorney; one (1) person employed or retired from an industrial or commercial establishment regulated by this article; one (1) person that is experienced in the science or practice of finance; one (1) member of the Board that is nominated by a regional user located in the State of Georgia, subject to approval by the mayor and confirmation by the city council of Chattanooga; one (1) Board member that is nominated by a regional user in the State of Tennessee, subject to approval by the mayor and confirmation by the city council of Chattanooga; and one (1) person that has no other qualification other than being an adult citizen of the area served by the regional system.  Pursuant to Section 31-57(c)(9) of the Chattanooga City Code, the Board shall hold an annual meeting.  Pursuant to the Consent Decree, Chattanooga shall review with the Board at its annual meeting the requirements under the Consent Decree and the annual budget for meeting those requirements.  Within seven (7) Months after the Effective Date of the Consent Decree, Chattanooga shall also develop a Community Input Program for Chattanooga to provide education to the public and solicit input from the public on the implementation of the Consent Decree, which it shall present to the Board for its review and approval.  Chattanooga agrees that if the Chattanooga City Code is modified such that the Board is modified or eliminated, that it will provide notice to EPA and, if the Board is eliminated, it will submit to EPA for review and approval within seven (7) Months after Board elimination a mechanism to replace the functions of the Board identified herein.  Such revisions

-23-

shall not be considered material modifications to the Consent Decree for purposes of Section XIX (Modification).

20. <u>Capacity, Management, Operation and Maintenance ("CMOM") Programs</u>. Chattanooga shall develop and implement the CMOM programs as provided below. All CMOM programs shall be developed in accordance with EPA Region IV guidance, as set forth in the CDROM disk attached hereto as <u>Appendix B</u>. Chattanooga shall ensure that each CMOM program has a written, defined purpose; a written, defined goal; is documented in writing with specific detail; is implemented by appropriately trained personnel; has established performance measures; and has written procedures for periodic review. The Parties recognize that Chattanooga may need or want to revise the CMOM Programs set forth below during the term of this Consent Decree. Such revisions shall not be considered material modifications to the Consent Decree for purposes of Section XIX (Modification). However, Chattanooga must obtain EPA's written approval of any revision to the substance of any CMOM Program required by this Consent Decree and shall comply with the provisions of Section V. Chattanooga may revise the form of any CMOM Program required by this Consent Decree without EPA's approval and shall provide a copy of any revised Program to EPA and TDEC, and place a copy of any such revised Program in the PDR within seven (7) Days after making such revision.

(a). <u>Sewer Overflow Response Protocol ("SORP")</u>. Within seven (7) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a SORP, including a schedule for full implementation of the program, to provide for Chattanooga's timely and effective response to all SSOs. The SORP shall have the following components:

-24-

i.     <u>Staff Communication and Duties</u>.  Chattanooga shall establish procedures for ensuring that it is made aware of all SSOs as expeditiously as possible, and shall document in writing the responsibilities of employees (by position) charged with responding to SSOs.

ii.     <u>Prompt Response to SSOs</u>.  Chattanooga shall make all reasonable efforts to respond to an SSO in a timely manner after being notified of an SSO.  Chattanooga shall maintain records of all SSO responses, including response times.

iii.     <u>Public Notification</u>.    Chattanooga shall establish procedures for providing appropriate notice to the public (e.g., through the local news media or other means including without limitation signs or barricades to restrict access) that may be impacted by an SSO.

iv.     <u>Assessment of Cause and Impact</u>.  Chattanooga shall establish procedures for identifying the cause of an SSO, for identifying the extent of potential threats to human health or the environment from the SSO, and for quantifying the volume and duration of the SSO.  The SORP shall clearly identify the process a customer may follow to dispute a determination by Chattanooga that a wastewater backup into a building is caused by a blockage or other malfunction of a Private Lateral, and therefore is not a Building Backup.

v.     <u>Elimination of Cause and Mitigation of Impact</u>.  Chattanooga shall establish procedures for remedying the cause of an SSO.  Standard repairs for typical SSO causes shall be identified, as shall the resources needed and available for such repairs.  Procedures for diverting flow around blockages or line failures shall be included, as shall

-25-

procedures for minimizing human contact with overflowed sewage. Standard containment procedures for typical SSOs shall be identified.

vi. Cleanup of SSOs. Chattanooga shall establish procedures for cleaning up all SSOs completely and expediently, and for minimizing adverse impact to human health or the environment from the SSO. With respect to Building Backups, the repair and mitigation procedures shall include measures necessary to disinfect and/or remove items potentially contaminated by the Building Backup. These may include wet vacuuming or other removal of spillage, wiping floors and walls with cleaning solution and disinfectant, flushing out and disinfecting plumbing fixtures, carpet cleaning and/or replacement, and other appropriate measures to disinfect and/or remove items potentially contaminated by the Building Backup.

vii. Regulatory Reporting. Chattanooga shall provide notice to TDEC of an SSO as required by the NPDES Permit, including without limitation, within twenty-four (24) hours of the time it becomes aware of an SSO.

viii. Training. Chattanooga shall provide adequate training necessary for Chattanooga employees, contractors, and personnel of other affected agencies to effectively implement the SORP. The SORP shall provide training guidelines to ensure adequate response training is provided to management and field personnel responsible for responding to SSOs. Chattanooga shall establish procedures, and provide adequate training to response personnel, for estimating volumes from SSOs.

(b). Emergency Response Plan. Within nineteen (19) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment an Emergency Response Plan ("ERP"), including a schedule for full

implementation of the program. The ERP shall address emergencies that include situations such as floods, tornados, earthquakes or other natural events, serious chemical spills, and widespread electrical failure. The ERP shall address areas of vulnerability and determine the effect of such a failure to operations, equipment, and public safety and health based upon such factors as topography, weather, sewer system size, and other site-specific factors. The ERP shall have the following components:

i. <u>Sewer System</u>. The WCTS component of the ERP shall establish standard operating procedures for use in emergency operations, including identification of the actions staff should take in the event of emergency situations (specific to the type of emergency that could occur); criteria for initiating and ceasing emergency operations; identification of appropriate repair equipment and sources thereof; and instructions on how to operate equipment and systems during an emergency when they are not functioning as intended but are not fully inoperable. The WWTP component of the ERP shall also establish standard operating procedures for use in an emergency situation at the WWTP, including changes in process controls.

ii. <u>Public Notification of Emergencies</u>. In addition to the reporting requirements set forth in Section IX (Reporting Requirements), Chattanooga shall establish, in coordination with public health authorities: (A) criteria to be used as the basis for immediately notifying the public and other impacted entities, such as users with a downstream water intake, of an emergency situation caused by an SSO, Prohibited Bypass, or effluent limit violation; (B) a list identifying, by name, phone number and pager number, all Chattanooga staff who are responsible for notifying the public; (C) a list identifying, by name and phone number, all public

contacts, including local media outlets, who must be contacted during an emergency situation; (D) a list identifying Chattanooga staff who are authorized to make public statements during emergency situations; and (E) pre-scripted news releases for various types of emergency situations.

iii.    Notification of Regulatory Authorities.  In addition to the notification requirements set forth in the NPDES Permit, and the reporting requirements set forth in Section IX (Reporting Requirements), Chattanooga shall establish, in coordination with public health authorities: (A) criteria to be used as the basis for immediately notifying regulatory authorities, TDEC, and the public health authorities of any emergency situation caused by an SSO, Prohibited Bypass, or effluent limit violation; (B) a list identifying, by name, phone number and pager number, all Chattanooga staff who are responsible for notifying the regulatory authorities; and (C) a list identifying, by name and phone number, all officials who must be contacted.

(c).    Fats, Oils, and Grease ("FOG") Management Program.  Chattanooga has developed and has been implementing a Fats, Oils and Grease ("FOG") Management Program since its FOG ordinance was adopted in June 2005.  Notwithstanding any improvements already achieved through its FOG Management Program, Chattanooga shall fully re-evaluate its FOG Management Program to determine if its effectiveness can be improved.  No later than thirteen (13) Months from the Effective Date of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment its FOG Management Program, including a schedule for full implementation of the program, and the results of its re-evaluation and any proposal to expand or modify its existing FOG Management Program to control further the entry of FOG into

-28-

Chattanooga's Sewer System. The FOG Management Program shall include, but not be limited to:

        i.      Establishment of a public education program directed at reducing the amount of grease entering the Sewer System from private residences.

        ii.      Establishment of methods to identify persistent sources of FOG causing problems in the WCTS and the best method or mechanism for addressing those sources.

        iii.      Establishment of performance indicators to be used by Chattanooga to measure the effectiveness of the FOG Management Program.

        (d).      <u>Gravity Line Preventive Maintenance Program</u>. Within thirteen (13) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Gravity Line Preventive Maintenance Program, including a schedule for full implementation of the program. The Gravity line Preventive Maintenance Program shall include, at a minimum, the following components:

        i.      A preventive hydraulic cleaning component which shall include protocols for implementing the routine hydraulic cleaning of Gravity Sewer Lines and which may vary depending on the size of the Gravity Sewer Line. This component shall include provisions for needs determination; establishing priorities and scheduling; hydraulic cleaning equipment to be used; standard hydraulic cleaning maintenance procedures; standard forms, records and performance measures; and a method for information management.

        ii.      A preventive mechanical cleaning component which shall include protocols for implementing the routine mechanical cleaning of Gravity Sewer Lines and which may vary depending on the size of the Gravity Sewer Line. This component shall include

-29-

provisions for needs determination; establishing priorities and scheduling; mechanical cleaning equipment to be used; standard mechanical cleaning maintenance procedures; standard forms, records and performance measures; and a method for information management.

iii.     A root control component which shall include protocols for implementing root control for Gravity Sewer Lines and which may vary depending on the size of the Gravity Sewer Line. This component shall include provisions for needs determination; establishing priorities and scheduling; root control methods and approaches; root control maintenance procedures; standard forms, records and performance measures; and a method for information management.

iv.     A manhole preventive maintenance component which shall include protocols for implementing a routine inspection and maintenance of manholes. This component shall include provisions for needs determination; establishing priorities and scheduling; inspection methods and approaches; standard maintenance procedures; standard forms, records and performance measures; and a method for information management.

v.     A process for addressing Gravity Sewer Line segments with repeated SSOs and an assessment of how all components of this program (Paragraph 20.(d).i. through v.) will work together to proactively maintain the integrity of the WCTS.

(e).     Pump Station Operations Program. Within nineteen (19) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Pump Station Operations Program, including a schedule for full implementation of the program. The Pump Station Operations Program shall include, at a minimum, the following components:

i.      Routine Pump Station Operations.  The Routine Pump Station

Operations component shall be developed to ensure proper Pump Station operations that will

necessitate prevention of Pump Station failure.  This program shall include, at a minimum, the

following:

(A)  Procedures for reading and recording information appropriate

to each Pump Station including, as applicable, pump run-time meter readings, start counters,

amperage readings, checking and resetting conditions, wet-well points, grease accumulations,

and any other information that is necessary for the proper operation of a Pump Station;

(B)  Development of standard inspection routes and schedules; and

(C)  Provisions for needs determination; establishing priorities and

scheduling; standard forms, records and performance measures; and a method for information

management.

ii.      Emergency Pump Station Operations.  The Emergency Pump

Station Operations component shall be developed to necessitate emergency operations in the

event of Pump Station failure.  This program shall provide guidance and ensure timely response

to atypical situations in the WCTS through the use of written standard emergency operating

procedures for each type of Pump Station and shall include, at a minimum, the following:

(A)  Emergency contact information;

(B)  Location(s) of auxiliary power including portable or fixed

emergency generators applicable to each Pump Station;

(C)  Location(s) of portable pumping equipment;

(D)  Guidance for initiating auxiliary power with portable or fixed generators;

(E)  Guidance for installing portable pumps during high flow;

(F)  Applicable contingency plans;

(G)  Standard forms, records, and performance measures and a method for information management; and

(H)  A description of each Pump Station monitoring system.

(f).    Pump Station Preventive Maintenance Programs  Within nineteen (19) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Pump Station Preventive Maintenance Program, including a schedule for full implementation of the program.  The Pump Station Preventive Maintenance Program shall include, at a minimum, the following components:

i.    An electrical maintenance component which shall provide guidance to managers and field personnel responsible for electrical maintenance to ensure that preventive maintenance on Pump Station electrical components are performed on a routine basis.  This component shall include meter calibration schedules for any meter used to record data collected at or from a Pump Station.

ii.    A mechanical maintenance component that shall provide guidance to managers and field personnel responsible for mechanical maintenance to ensure that preventive maintenance on Pump Station mechanical components are performed on a routine basis.

-32-

iii.     A physical maintenance component that shall provide guidance to managers and field personnel responsible for physical maintenance (pipes, walls, inverts, covers, etc.) to ensure that preventive maintenance on Pump Station physical components are performed on a routine basis.

iv.     A Pump Station repair component that shall serve as a reactive maintenance system to repair Pump Stations that are currently in a state of disrepair but still cost-effective to service.  This component shall provide for the identification, prioritization, scheduling, and repair of Pump Stations on a timely basis once a Pump Station has deteriorated beyond the scope of the preventive maintenance programs.  This component shall include, at a minimum, the following:

(A)  Guidance outlining when a Pump Station is to be placed in the program;

(B)  A prioritized inventory of Pump Stations in need of repair;

(C)  An ongoing inventory of completed repairs;

(D)  A work schedule for repairs; and

(E)  Standard forms, records, and performance measures and a method for information management.

(g).     Hydraulic Model Development.  Within thirty-seven (37) Months after the Effective Date of the Consent Decree, Chattanooga shall develop a computerized model of the WCTS (the "Hydraulic Model") using a hydraulic modeling software package.  The Hydraulic Model shall utilize a widely-accepted software package such as EPA's SWMM model or InfoWorks or one of the widely accepted commercial variants.  Chattanooga shall use the

-33-

Hydraulic Model in the assessment of the hydraulic capacity of the WCTS, and in the identification of appropriate remedial measures to address all capacity and condition limitations identified in its WCTS. Chattanooga shall develop the Hydraulic Model to provide a detailed understanding of the response of the WCTS to wet weather events and an evaluation of the impacts of proposed remedial measures and removal of I/I flow, as follows:

        i.     Chattanooga shall configure the Hydraulic Model to accurately represent the WCTS, in accordance with sound engineering practices. Chattanooga may model its WCTS in different levels of detail, as necessary to aid in the identification of the causes of wet weather-related SSOs, and to assess proposed remedial measures with the goal to eliminate those SSOs. Chattanooga's Hydraulic Model shall include as a minimum: all Major Gravity Lines; all Pump Stations; all Force Mains and all wet weather-related SSO locations (e.g., a 5-year look back of wet weather-related SSO locations).

        ii.     Chattanooga shall configure the Hydraulic Model using adequate, accurate, and sufficiently current physical data of the Sewer System, such as invert and ground elevations, pipe diameters, slopes, pipe run lengths, Manning roughness factors, manhole sizes and configurations, and pumping station performance factors. In particular, Chattanooga shall sufficiently field verify physical data to allow calibration and verification of the Hydraulic Model.

        iii.     Chattanooga shall calibrate and verify the Hydraulic Model using appropriate rainfall data, actual hydrographs, and flow data. As part of the calibration process, Chattanooga shall either use existing sensitivity analyses for the selected model, or perform its own sensitivity analyses, such that calibration effectiveness is maximized.

(h).    Capacity Assurance Program.

i.    The Program.  Within thirty-seven (37) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Capacity Assurance Program ("CAP"). The CAP shall identify each Sewershed or part of a Sewershed with insufficient capacity under either one (1) hour peak flows, or average conditions, or both, consistent with the capacity provisions of this Section.  It shall also analyze all portions of the SSS that hydraulically impact all known wet weather-related SSOs and all portions of the WWTP that may contribute to violations of the NPDES Permit.  The CAP shall assess the one (1) hour peak flow capacity of all major system components for existing and proposed flows.  The CAP shall enable Chattanooga to authorize new sewer service connections, or increases in flow from existing sewer service connections, only after Chattanooga certifies that the analysis procedures contained in the approved CAP have been used and that Chattanooga has determined, based on those procedures, that there is Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity as set forth in Paragraph 20.(h).ii. through ix. below.  At a minimum, the CAP shall contain all of the following components:

(A)  The technical information, methodology, and analytical techniques, including the model or software, to be used by Chattanooga to calculate collection, transmission, and treatment capacity;

(B)  The means by which Chattanooga will integrate its certification of Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate

Collection Capacity with the issuance of building permits, and Chattanooga's acquisition of new or existing sewers from other owners;

(C) A method for information management capable of tracking the Chronic Overflow Locations;

(D) The technical information, methodology, and analytical techniques, including the model or software, to be used by Chattanooga to calculate the net (cumulative) increase or decrease in volume of wastewater introduced to the SSS as a result of Chattanooga's authorization of new sewer service connections and increases in flow from existing connections and the completion of: (a) specific projects that add or restore capacity to the SSS or the WWTP ("Capacity Enhancing Projects"), (b) specific projects that reduce peak flow through removal of I/I ("I/I Projects"), and (c) permanent removal of sewer connections ("Removal of Connections");

(E) A method for information management capable of tracking the accumulation of banked credits, earned pursuant to Paragraph 20.(h).iv. below, from completion of Capacity Enhancing Projects, I/I Projects, and Removal of Connections; the capacity-limited portion of the Sewershed in which those credits were earned; and the expenditure of such credits on future increases in flow from new and existing sewer service connections in that capacity-limited portion of the Sewershed; and

(F) All evaluation protocols to be used to calculate collection, transmission, and treatment capacity including, but not limited to, standard design flow rate rules of thumb regarding pipe roughness, manhole head losses, as-built drawing accuracy (distance and slope), and water use (gallons per capita per day); projected flow impact calculation

-36-

techniques; and metering of related existing one (1) hour peak flows (flows metered in support of analysis and/or manual observation of existing one (1) hour peak flows). Chattanooga may identify sewer line segments which have been specifically designed and constructed to operate under surcharge conditions (e.g., segments with welded or bolted joints) and identify the level of surcharge for those segments.

ii.     Capacity Certifications.   Except as provided in Paragraph 20.(h).iii. through vi. below, after twenty-five (25) Months of EPA's approval of the CAP, Chattanooga shall authorize a new sewer service connection in the SSS, or additional flow from an existing sewer service connection in the SSS, only after it certifies that the analysis procedures contained in the approved CAP have been used and that Chattanooga has determined, based on those procedures, that there is Adequate Treatment Capacity, Adequate Transmission Capacity, and Adequate Collection Capacity as set forth in Paragraph 20.(h).ii.(A) through (E) below.

(A)  Treatment Capacity Certifications.  Chattanooga's certification of "Adequate Treatment Capacity" shall confirm that, at the time the WWTP receives the flow from a proposed sewer service connection(s) or increased flow from an existing sewer service connection(s), when combined with the flow predicted to occur from all other authorized sewer service connections (including those which have not begun to discharge into the WCTS), the WWTP will not be in "non-compliance" for quarterly reporting as defined in 40 C.F.R. Part 123.45, Appendix A.  In addition, upon EPA's approval of the Process Controls Program (see Paragraph 25 below), Chattanooga's certification of "Adequate Treatment

Capacity" shall confirm that the new or increased flow to the WWTP will not result in Prohibited Bypasses.

(B) <u>Transmission Capacity Certifications</u>. Chattanooga's certification of "Adequate Transmission Capacity" shall confirm that each Pump Station, through which the proposed additional flow from new or existing sewer service connections would pass to the WWTP, has the capacity to transmit, with its largest pump out of service (except for those Pump Stations with only one pump as of the Effective Date of the Consent Decree), the existing one (1) hour peak flow passing through the Pump Station, plus the addition to the existing one (1) hour peak flow predicted to occur from the proposed connection, plus the addition to the existing one (1) hour peak flow predicted to occur from all other authorized sewer service connections which have not begun to discharge into the SSS.

(C) <u>Collection Capacity Certifications</u>. Chattanooga's certification of "Adequate Collection Capacity" shall confirm that each Gravity Sewer Line in the SSS, through which the proposed additional flow from new or existing connections would pass, has the capacity to carry the existing one (1) hour peak flow passing through the Gravity Sewer Line, plus the addition to the existing one (1) hour peak flow from the proposed connection, plus the addition to the existing one (1) hour peak flow predicted to occur from all other authorized sewer service connections which have not begun to discharge into the SSS without causing a Surcharge Condition.

(D) <u>Definition of "One (1) Hour Peak Flow" and "Surcharge Condition"</u>. For purposes of this Paragraph 20.(h). only, the term "one (1) hour peak flow" shall mean the greatest flow in a sewer averaged over a sixty (60) minute period at a specific location

-38-

expected to occur as a result of a representative 2 year-24 hour storm event. For purposes of this Paragraph 20.(h). only, the term "Surcharge Condition" shall mean the condition that exists when the supply of wastewater resulting from the one (1) hour peak flow is greater than the capacity of the pipes to carry it and the surface of the wastewater in manholes rises to an elevation greater than twenty-four (24) inches above the top of the pipe or within thirty-six (36) inches of the rim of the manhole, and the sewer is under pressure or head, rather than at atmospheric pressure, unless Chattanooga has, pursuant to Paragraph 20.(h).i.(F), above, identified that pipe segment and manhole as designed to operate in that condition, in which case the identified level of surcharge will be used. Notwithstanding the foregoing, no criteria contained in the CAP shall be construed as setting standards for the ultimate design or rehabilitation of Chattanooga's SSS.

(E) <u>Minor Sewer Connections</u>. For minor sewer service connections, Chattanooga may elect to perform a Quarterly capacity analysis for each Sewershed or part of a Sewershed by certifying that the Sewershed has adequate capacity, as defined in Paragraph 20.(h).ii.(A) through (C) above, to carry the existing one (1) hour peak flows and the additional flows generated by all such minor sewer service connections projected to be approved in the subsequent Quarter. For any Sewershed or part of a Sewershed which can be so certified, Chattanooga may approve these projected minor sewer service connections without performing individual certifications for each connection. For the purposes of this subparagraph, a "minor sewer service connection" is a connection with an average flow not to exceed 2,500 gallons per day.

iii.     <u>Chronic Overflow Locations</u>.  Notwithstanding the provisions of Paragraph 20.(h).ii., Chattanooga shall not authorize a new sewer service connection or an increase in flow from an existing connection in any part of a Sewershed up sewer from a Chronic Overflow Location unless Chattanooga certifies that the cause(s) of the Chronic Overflow Location has been or will be eliminated, or Chattanooga satisfies the requirements of Paragraph 20.(h).iv., v. or vi. below.  Any new sewer service connection or increase in flow from an existing connection authorized prior to the elimination of such cause(s) of the Chronic Overflow Location shall be conditioned upon the completion of any project eliminating such cause(s) prior to the time that the new sewer service connection or flow increase is introduced into the SSS. For purposes of this subparagraph, "Chronic Overflow Location" shall mean those locations within 500 yards of each other that have experienced collectively, within the twelve (12) Months prior to the date of certification, more than five (5) SSOs; provided, however, for purposes of this definition only, SSOs occurring within 500 yards of each other that are caused by a Single Rainfall Event shall be counted as one (1) SSO at the location of the largest SSO.  For purposes of this Section, "Single Rainfall Event" shall have the meaning as defined in Part 4 of Chattanooga's NPDES Permit, which provides: "A 'rainfall event' is defined as any occurrence of rain, preceded by ten (10) hours without precipitation, that results in an accumulation of 0.01 inches or more.  Instances of rainfall occurring within ten (10) hours of each other will be considered a single rainfall event."

iv.     <u>Capacity for Treatment, Transmission and Collection in Lieu of Certification</u>.  Chattanooga may authorize a new sewer service connection, or additional flow from an existing sewer service connection, even if it cannot satisfy the requirements of

-40-

Paragraph 20.(h).ii. and/or iii. above, provided Chattanooga certifies that all of the following provisions, where applicable, are satisfied:

(A)  Chattanooga is in substantial compliance with this Consent Decree;

(B)  The sewer lines which will convey the proposed additional flow from new or existing sewer service connections have not experienced dry weather SSOs due to inadequate capacity within the previous twelve (12) Months; or, in the alternative, the causes of any dry weather SSOs due to inadequate capacity have been eliminated;

(C)  Chattanooga has identified the sewer line segment(s), Pump Station(s) and/or wastewater treatment systems that do not meet the conditions for certification of Adequate Treatment Capacity, Adequate Collection Capacity, and/or Adequate Transmission Capacity;

(D)  Chattanooga has identified the sewer line segment(s) that constitute a Chronic Overflow Location(s);

(E)  Chattanooga shall complete, prior to the time the proposed additional flow from new or existing sewer service connections is introduced into the SSS, specific Capacity Enhancing Projects, I/I Projects, and/or Removal of Connections which will add sewer capacity or reduce peak flows to the identified sewer line segment(s), Pump Station(s), wastewater treatment system(s), and/or Chronic Overflow Location(s) in accordance with the factors set forth in subparagraphs (F) and (G) below;

(F)  Where Chattanooga has undertaken specific Capacity Enhancing Projects that provide for additional off-line storage and/or specific Removal of

-41-

Case 1:12-cv-00245-CLC-SKL   Document 12   Filed 04/24/13   Page 41 of 95   PageID #: 489

Connections to satisfy the requirements of subparagraph (E) above, the estimated added capacity resulting from such projects must be equal to or greater than the estimated amount of any proposed additional flow;

(G)  Where Chattanooga has undertaken specific I/I Projects or Capacity Enhancing Projects, other than those that provide for additional off-line storage, to satisfy the requirements of subparagraph (E) above, the estimated reduction in peak flows or added capacity resulting from such projects must exceed the estimated amount of any proposed additional flow by the following factors: (a) a factor of 4:1 for I/I Projects and such other Capacity Enhancing Projects related to a Chronic Overflow Location; and (b) a factor of 2:1 for I/I Projects and such other Capacity Enhancing Projects not related to a Chronic Overflow Location;

(H)  Commencing twelve (12) Months after EPA approves the CAP and annually thereafter, Chattanooga has performed a review of specific Capacity Enhancing Projects and I/I Projects undertaken to determine if actual added capacity and one (1) hour peak flow reductions are in line with what Chattanooga originally estimated for such projects; and Chattanooga has used the results of this review to adjust future estimates as necessary;

(I)  Any new sewer service connection or increase in flow to an existing connection authorized prior to the completion of a necessary added capacity or one (1) hour peak flow reduction project as set forth above shall be conditioned upon completion of such project prior to the time that the new sewer service connection or flow increase is introduced into the SSS;

-42-

(J)  In implementing the provisions of this Paragraph 20.(h).iv., Chattanooga may use a "banking credit system" for the sewer line segment(s), Pump Station(s), wastewater treatment systems, and/or Chronic Overflow Locations for which Chattanooga is not able to satisfy the conditions set forth in Paragraph 20(h).ii. and iii. above.  The addition of sewer capacity and/or reduction in one (1) hour peak flows from Capacity Enhancement Projects, I/I Projects, and Removal of Connections, completed after the Effective Date of this Consent Decree, to the affected sewer line segment, pump station, wastewater treatment system, or Chronic Overflow Location may be accumulated in the form of credits in the banking credit system in accordance with the factors set forth in subparagraphs (H) and (I) above, which may then be used for authorization of future sewer service connections or increases in flow from existing connections to the affected sewer line segment, Pump Station, wastewater treatment system, or Chronic Overflow Location in the capacity-limited portion of the Sewershed; and

(K)  Following EPA's approval of the CAP, Chattanooga shall also establish a list of all authorized new sewer service connections or increases in flow from existing connections which flows have not yet been introduced into the SSS.  The following information shall be recorded for each authorized connection: street address, estimated average daily flow, estimated peak flow, Sewershed, WWTP, date authorized, and estimated Calendar Quarter when the additional flow from the connection will begin.  Chattanooga shall update and maintain this list until full implementation of the CAP, as approved by EPA, and, upon introduction into the SSS, any such new sewer service connections or increases in flow from existing connections shall be accumulated in the form of debits in the banking credit system.

-43-

v.  **Essential Services**.  Notwithstanding the provisions of Paragraph 20.(h).ii. and iii. above, Chattanooga may authorize a new sewer service connection, or additional flow from an existing sewer service connection, even if it cannot certify that it has Adequate Transmission Capacity, Adequate Collection Capacity, and/or Adequate Treatment Capacity as set forth in Paragraph 20.(h).ii.(A), (B) and (C) above for health care facilities, public safety facilities, public schools, government facilities, and other facilities as agreed upon in writing by EPA; and in those cases where a pollution or sanitary nuisance condition exists, as determined by Chattanooga-Hamilton County Health Department or its regulatory successor, as the result of a discharge of untreated wastewater from an on-site septic tank.  For all such new service connections, or additions to flow from an existing connection, Chattanooga shall make the appropriate subtraction to the balance in the credit bank described in Paragraph 20.(h).iv. above.

vi.  **Existing Illicit Connections**.  Notwithstanding the provisions of Paragraph 20.(h).ii. and iii. above, Chattanooga may authorize a new sewer service connection, or additional flow from an existing sewer service connection, even if it cannot certify that it has Adequate Transmission Capacity, Adequate Collection Capacity, and/or Adequate Treatment Capacity as set forth in Paragraph 20.(h).ii.(A), (B) and (C) above for any illicit connections or discharge of wastewater to the stormwater system or to waters of the State.  For all such new service connections or additions to flow from an existing connection, created before the Effective Date of the Consent Decree that result from the elimination of illicit connections or discharges, Chattanooga shall not be required to make a subtraction from the balance in the credit bank described in Paragraph 20.(h).iv. above.  For all such new service connections or

-44-

additions to flow from an existing connection created after the Effective Date of the Consent Decree that result from the elimination of illicit connections or discharges, Chattanooga shall make a subtraction from the balance in the credit bank described in Paragraph 20.(h).iv. above.

vii.    Reconnections following Termination as a Result of Chattanooga's Private Lateral Program.  Notwithstanding the provision of Paragraph 20(h)(ii)-(iv) above, in the event of a temporary suspension or interruption of a customer's service as a result of Chattanooga's Private Lateral program, any service that is resumed from a newly replaced or repaired Private Lateral shall not be deemed to be a new service connection or an addition to flow from an existing connection.

viii.    Certifications.  All certifications pursuant to this Paragraph 20.(h). shall be made by a professional engineer registered in the State of Tennessee and shall be approved by a responsible party of Chattanooga as defined by 40 C.F.R. § 122.22(b). Chattanooga shall maintain all such certifications, and all data on which the certifications are based, in its offices for inspection by EPA and TDEC.   EPA, TDEC, and TCWN may request, and Chattanooga shall provide, any and all documentation necessary to support any certification made by Chattanooga pursuant to this Paragraph 20.(h)., and make available, to the extent possible, individuals providing such certifications to meet with EPA and TDEC.

ix.    Upon its execution of this Consent Decree and until EPA approves the CAP as required by this Paragraph 20.(h), Chattanooga agrees to continue to implement its current capacity program, to ensure that new sewer service connections, or increases in flow from existing sewer service connections, are authorized only if there will be adequate treatment,

transmission, and collection capacity prior to the time such proposed additional flow is introduced into the WCTS.

(i). <u>Inter-Jurisdictional Agreement Program</u>. Within thirteen (13) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment an Inter-Jurisdictional Agreement Program, including a schedule for full implementation of the program, for when Chattanooga renews existing agreements or enters into new agreements that cover the collection, conveyance, and treatment of sewage by Chattanooga from municipal satellite sewer systems. The Inter-Jurisdictional Agreement Program shall include, at a minimum, the following components:

i. A delineation of the minimum provisions to be set forth in these inter-jurisdictional agreements with which the contracting municipality must comply. Such provisions shall include, but not be limited to, the following:

(A) Flow limitation requirements on the contracting party to ensure adequate capacity within Chattanooga's WCTS;

(B) Requirements on the contracting party to properly manage, operate, and maintain its sewage collection and conveyance systems so as to minimize peak flows into Chattanooga's WCTS by excluding, to the maximum reasonable extent, the intrusion of surface and ground water and other extraneous flows; and

(C) Requirements on the contracting party to ensure compliance with the legal authorities required in 40 C.F.R. § 403.8(f) with regard to equivalent control, monitoring, and enforcement of industrial use dischargers into Chattanooga's WCTS from municipal satellite sewer systems.

-46-

ii.     A delineation of provisions addressing the term or life of these agreements; mechanisms for appropriate modification of the agreements; and mechanisms for enforcement of the agreements (including a description of the legal support necessary to develop, oversee and enforce the agreements) such as provisions permitting termination of the agreement and physical disconnection from Chattanooga's WCTS within a reasonable time not exceeding two (2) years upon the failure of the contracting party to comply with its capacity, management, operations, and maintenance obligations.

iii.     Provisions for when any of Chattanooga's currently existing agreements expire or terminate, Chattanooga may, but shall not be required to, renew any such agreement or enter into a new agreement covering the collection, conveyance, and treatment of sewage from such other municipal satellite sewer system.  In the event Chattanooga does renew such an agreement or enters into any such new agreement, each agreement shall be consistent with the requirements of the Inter-Jurisdictional Agreement Program.

21.     <u>Sanitary Sewer Evaluation Study ("SSES") Work Plan</u>.

(a).     Within nineteen (19) Months after the Effective Date of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a SSES Work Plan to assess, analyze, and rehabilitate the infrastructure of the WCTS to, among other things, address I/I, structural defects, and the other conditions causing, or that are likely to cause, SSOs.  Chattanooga shall develop and implement the SSES Work Plan in accordance with sound engineering practices and the following guidance documents:  EPA's *Handbook: Sewer System Infrastructure Analysis and Rehabilitation*, EPA/625/6-91/030, October 1991; Water Environment Federation's Manual of Practice FD-6, *Existing Sewer Evaluation &*

-47-

*Rehabilitation*, 1994; EPA's guidance: *Computer Tools for Sanitary Sewer System Capacity Analysis and Planning*, EPA/600/R-07/111, October 2007; and the *Tennessee Design Criteria for Sewage Works* in accordance with Tenn. Comp. R. & Regs., ch. 1200-4-2-.03.

(b).     The SSES Work Plan shall establish procedures for setting priorities and expeditious schedules for undertaking the WCTS assessment and rehabilitation components set forth in Subparagraphs 21.(c).i. through viii. below.  Chattanooga shall develop these priorities and expeditious schedules taking into consideration the nature and extent of customer complaints; flow monitoring, including flow isolation studies; location and cause of SSOs; any remedial measures already undertaken; field crew work orders; any preliminary sewer assessments; and any other relevant information.  In addition, areas near surface waters that have been included on TDEC's CWA Section 303(d) list of impaired waters for pathogens shall also receive priority by Chattanooga.  Finally, Chattanooga shall also consider areas that have been identified by EPA as potentially having environmental justice issues (minority and/or low income neighborhoods) when developing the priorities.

Furthermore, Chattanooga has completed an initial flow monitoring study in which it has divided the WCTS into approximately equal sized Sewersheds and ranked the Sewersheds based on the normalized net rainfall-induced I/I ("RD I/I") (defined for purposes of this Consent Decree only as twenty (20) gallons per day per linear foot) in gallons per day per linear foot for each Sewershed.  Based on this information, along with other criteria, Chattanooga shall implement the SSES Work Plan in two (2) phases.  SSES Phase I shall be completed on or before five (5) years after EPA's approval of the SSES Work Plan and shall include the following five (5) Sewersheds, as shown on the map attached hereto as Appendix A,

-48-

which represent areas with the most normalized net RD I/I: Chattanooga Creek 4; Dobbs Branch 3; South Chickamauga Creek 1; South Chickamauga Creek 5; and South Chickamauga Creek 16. However, if Chattanooga determines based on new data or information that a different Sewershed should replace one of the five (5) Sewersheds identified above, Chattanooga shall submit a request in writing to EPA and TDEC for such replacement along with a detailed explanation justifying the proposed replacement. Any such replacement approved by EPA shall not constitute a material modification to this Consent Decree as set forth in Section XIX (Modification) below. SSES Phase II shall be completed for the remaining twenty four (24) Sewersheds, as shown on the map attached hereto as Appendix A, within fifteen (15) years after EPA's approval of the SSES Work Plan.

(c).     The SSES Work Plan shall include standard procedures for an information management system, performance goals for each of the components of the SSES Work Plan set forth below, and procedures for analysis of the effectiveness of completed rehabilitation. The SSES Work Plan shall include the following components:

i.     Corrosion Defect Identification. The Corrosion Defect Identification component of the SSES Work Plan shall establish standard procedures for inspecting and identifying WCTS infrastructure that is either corroded or at risk of corrosion. The Corrosion Defect Identification component shall include a system for prioritizing repair of existing corrosion defects, corrosion identification forms, and procedures for a corrosion defect analysis.

ii.     Manhole Condition Assessment and Rehabilitation. The Manhole Condition Assessment and Rehabilitation component of the SSES Work Plan shall establish

standard procedures for the condition assessment of manholes within the WCTS. This component shall include manhole inspection forms and procedures for a manhole defect analysis. This component shall also establish a process for setting manhole rehabilitation priorities and expeditious schedules; shall establish an ongoing inventory of manhole rehabilitation, including identification of the rehabilitation techniques to be used; and shall require an analysis of the effectiveness of completed rehabilitation.

        iii.    <u>Flow Monitoring</u>. The Flow Monitoring component of the SSES Work Plan shall establish procedures for initiating routine flow monitoring during dry and wet weather to support engineering analyses related to Sewer System capacity and peak flow studies. Dry weather monitoring shall be carried out so as to allow the characterization of base flows and I/I rates within the WCTS. Wet weather monitoring shall be conducted periodically during events of sufficient duration and intensity that cause significant I/I into the WCTS. The procedures shall identify the process used to establish flow monitoring locations, appropriate flow monitoring techniques, sewer cleaning associated with flow monitoring and a procedure for rainfall measurement.

        iv.    <u>Closed Circuit Television ("CCTV") Inspection</u>. The CCTV inspection component of the SSES Work Plan shall establish standard procedures for CCTV inspection within the WCTS to support sewer assessment and rehabilitation activities, and shall include procedures for CCTV cleaning and a process for the retention and retrieval of CCTV inspection data.

        v.    <u>Gravity Sewer Line Defect Analysis and Rehabilitation</u>. The Gravity Sewer Line and Force Main defect analysis component of the SSES Work Plan shall

establish standard procedures for analysis of Gravity Sewer Line defects within the WCTS

which may vary depending on the size of the Gravity Sewer Line. Such procedures shall

include Private Lateral investigations to identify sources of I/I to the WCTS. The Gravity

Sewer Line Defect Analysis component shall establish standard defect codes, defect

identification procedures and guidelines, and a standardized process for cataloging Gravity

Sewer Line defects. This component shall also establish a process for setting Gravity Sewer

Line rehabilitation priorities and expeditious schedules; shall establish an ongoing inventory of

Gravity Sewer Line rehabilitation, including identification of the rehabilitation techniques to

be used; and shall require an analysis of the effectiveness of completed rehabilitation.

vi.     Force Main Condition Assessment and Rehabilitation. The Force

Main Condition Assessment and Rehabilitation component of the SSES Work Plan shall

establish standard procedures for the condition assessment of Force Mains within the WCTS.

This component shall include inspection forms and procedures for a Force Main defect

analysis. This component shall also establish a process for setting Force Main rehabilitation

priorities and expeditious schedules; shall establish an ongoing inventory of Force Main

rehabilitation, including identification of the rehabilitation techniques to be used; and shall

require an analysis of the effectiveness of completed rehabilitation.

vii.    Smoke Testing. The Smoke Testing component of the SSES Work

Plan shall establish standard procedures for smoke testing of the Gravity Sewer Lines within

the WCTS to identify sources of I/I, including cross connections and other unauthorized

connections. Such procedures shall include Private Lateral investigations to identify sources

of I/I.

viii.    <u>Pump Station Performance and Rehabilitation</u>.  The Pump Station

Performance and Rehabilitation component of the SSES Work Plan shall establish standard

procedures for the evaluation of Pump Station performance and Pump Station adequacy within

the WCTS.  The Pump Station Performance and Rehabilitation component shall include:

(A)    The use of pump run time meters; pump start counters;

computation of Nominal Average Pump Operating Time ("NAPOT"); root cause failure

analysis protocols; and appropriate remote sensing such as Supervisory Control and Data

Acquisition ("SCADA");

(B)    The evaluation of station capacity, as described in the

*Pumping Systems* chapter of the most current version of WEF's Manual of Practice FD-4,

*Design of Wastewater and Stormwater Pumping Stations*;

(C)    The evaluation of critical response time, defined as the time

interval between activation of the high wet well level alarm and the first (1st) SSO, under peak

flow conditions;

(D)    The evaluation of station conditions, based upon both

physical inspection and recent operating and mechanical failure history during at least the past

five (5) years;

(E)    The evaluation of station design and equipment, including

redundancy of pumps and electrical power supply, and other equipment installed, based upon

Chapter 40, *Wastewater Pumping Stations* of the most recent edition of *Recommended*

*Standards for Wastewater Facilities* by the Great Lakes-Upper Mississippi River Board of

State and Provincial Public Health and Environmental Managers (commonly known as the "Ten State Standards");

(F)     The evaluation of the ability of maintenance personnel to take corrective action within the critical response time calculated for each Pump Station; and

(G)     A process for setting Pump Station rehabilitation priorities and expeditious schedules and an ongoing inventory of Pump Station rehabilitation, including identification of the rehabilitation techniques to be used, and an analysis of the effectiveness of completed rehabilitation.

22.     <u>Early Action Capital Improvement Projects</u>.  Based on previous investigations, Chattanooga has identified certain rehabilitation and other projects that are intended to address conditions currently causing SSOs in the WCTS and other violations alleged in the Complaint and the TCWN Complaint which shall be referred to as "Early Action Capital Improvement Projects."  The Early Action Capital Improvement Projects are identified and described in <u>Appendix C</u>, attached hereto and incorporated herein.  Chattanooga contends that the Early Action Capital Improvement Projects, along with the Sewersheds to be remediated in SSES Phase I, constitute approximately fifteen percent (15 %) of the WCTS by linear foot. Chattanooga shall complete each of these Early Action Capital Improvement Projects in accordance with the schedules set forth in <u>Appendix C</u>.  Such schedules do not extend past five (5) years after the Effective Date of this Consent Decree.  Any change to this list of projects or schedule approved by EPA shall not constitute a material modification to this Consent Decree as set forth in Section XIX below.

23.     East Bank/West Bank Outfall Assessment and Rehabilitation Plan.

Chattanooga's WCTS has experienced SSOs containing large volumes of wet weather flow

from the CSS and SSS at unpermitted outfalls known as the East Bank Outfall and the West

Bank Outfall.  Based on previous investigations, Chattanooga contends that the SSOs from

these unpermitted outfalls will be eliminated through the reduction of I/I in the WCTS as a

result of implementation of the Inter-jurisdictional Agreement Program, SSES Phase I, and the

Early Action Capital Improvement Projects.  However, in the event that either the East Bank

Outfall or the West Bank Outfall experiences an SSO within the first (1st) year following

completion of SSES Phase I and the Early Action Capital Improvement Projects, Chattanooga

shall submit to EPA and TDEC for review and comment within seven (7) Months after such

SSO event an East Bank/West Bank Assessment and Rehabilitation Plan to eliminate SSOs

from these unpermitted outfalls.  The Parties acknowledge that this Plan may include a

proposal by Chattanooga to have the East Bank and/or West Bank Outfall permitted as a CSO

Outfall.  The East Bank/West Bank Assessment and Rehabilitation Plan shall include

expeditious schedules for specific assessment and rehabilitation projects for the elimination of

the SSOs and/or the potential permitting of the East Bank and/or West Bank Outfall as a CSO

Outfall.  Such expeditious schedules shall not exceed seven (7) years after EPA approves the

East Bank/West Bank Assessment and Rehabilitation Plan.

24.     Long Term Control Plan Updates.  In 1989, Chattanooga developed and began to

implement a Combined Sewer Overflow Facilities Plan.  This plan predated EPA's 1994 CSO

Control Policy and thus, while it may have contained many of the elements of a Long Term

Control Plan as required in the CSO Control Policy, it did not adequately include or address all

of the required components of a Long Term Control Plan. Therefore, Chattanooga shall submit the Long Term Control Plan Updates set forth below to satisfy certain requirements of the CSO Control Policy.

(a).     Additional Operational Plan for Chattanooga Creek CSO Outfalls.
Despite Chattanooga's implementation of CSO control measures pursuant to its Combined Sewer Overflow Facilities Plan, CSO discharges from the Central Avenue CSO Outfall (Outfall 002 in the NPDES Permit) and the Williams Street CSO Outfall (Outfall 003 in the NPDES Permit), both of which discharge into Chattanooga Creek, are not in compliance with State water quality standards for dissolved oxygen and Escherichia coli ("*E. coli*") as set forth in the Tennessee Water Quality Criteria Chapter 1200-4-3. As a result, within forty-eight (48) Months after the Effective Date of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment an Additional Operational Plan for the Chattanooga Creek CSO Outfalls (Central Avenue CSO Outfall and William Street CSO Outfall) that shall provide for additional long term CSO controls for these CSO outfalls that will ensure discharges from these CSO outfalls will comply with State water quality standards in accordance with the CSO Control Policy. Such Additional Operational Plan shall include expeditious schedules for implementation and completion of such CSO controls not to exceed three (3) Years from EPA's approval of the Additional Operational Plan.

(b).     Post Construction Compliance Monitoring Program. Within nineteen (19) Months after the Effective Date of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Post Construction Compliance Monitoring Program for the CSO outfalls that discharge into Chattanooga Creek (Central Avenue CSO Outfall and William

Street CSO Outfall) in accordance with Section II.C.9 of the CSO Control Policy to verify compliance of such discharges with State water quality standards and protection of designated uses as well as to ascertain the effectiveness of CSO controls. The Post Construction Monitoring Program shall be developed in consideration of the effects of reservoir operations and the effects of the tributaries to Chattanooga Creek. Both far-field and near-field water quality models should be employed to predict the area of impact from the CSOs. The program shall include a map of the monitoring stations, monitoring schedules (including the frequency and duration of sampling at each station), a parameter list, a discussion of monitoring protocols, and a quality assurance project plan. The program shall also include data collection to measure the overall effects of the program on water quality and to determine the effectiveness of CSO controls. Monitoring should be coordinated with any ongoing or planned state monitoring programs, programs of other permittees within the same watershed, or both. The program shall include expeditious schedules for conducting such monitoring, and such schedules shall take into consideration the schedule for completion of the CSO control measures Chattanooga will implement pursuant to the Additional Operational Plan for these CSO outfalls as set forth in the above paragraph.

(c). <u>Maximizing Treatment at the Moccasin Bend WWTP</u>. Chattanooga's Moccasin Bend WWTP has experienced Bypasses of flow from its treatment processes. Based on previous investigations, Chattanooga contends that most, if not all, of these Bypass events in the future may be avoided through the reduction of I/I in the WCTS as a result of implementation of the Inter-jurisdictional Agreement Program, SSES Phase I and the Early Action Capital Improvement Projects. However, in the event that a Bypass occurs within the

-56-

first (1st) year following completion of SSES Phase I and the Early Action Capital Improvement Projects, Chattanooga shall submit to EPA and TDEC for review and comment within twelve (12) Months after such Bypass event a Feasible Alternatives Analysis in accordance with Section II.C.7 of the CSO Control Policy. The Feasible Alternatives Analysis shall include an assessment and proposal for implementation of any feasible alternatives to prevent the Bypass of flow from any treatment process. In addition, at a minimum, in order to provide support for any Bypass of flow legally in accordance with 40 C.F.R. § 122.41(m), the Feasible Alternatives Analysis shall provide justification for the cut-off point at which the flow at the Moccasin Bend WWTP will be diverted from the secondary treatment portions of the WWTP, and provide a benefit-cost analysis demonstrating that conveyance of wet weather flow to the WWTP for primary treatment is more beneficial than other CSO abatement alternatives such as storage and pump back for secondary treatment, sewer separation, or satellite treatment. In the event the Feasible Alternatives Analysis proposes implementation of certain feasible alternatives to prevent the Bypass of flow, such Analysis shall include expeditious schedules for specific rehabilitation projects that shall not exceed seven (7) years from the date of submittal of the Feasible Alternatives Analysis.

25. <u>Moccasin Bend WWTP Process Controls Program</u>. Within nineteen (19) Months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Process Controls Program designed to minimize the frequency, duration, and volume of any Bypass and violation of an effluent limit at the Moccasin Bend WWTP through proper management, operation and maintenance controls. The Process Controls Program shall include, but not be limited to, the following:

-57-

(a).     Identification of necessary activities to insure that SSOs from the East and West Bank Outfalls are minimized to the greatest extent possible.

(b).     Identification of staffing needs to insure that plant operators are present during periods during which the WWTP is likely to have a Bypass.

(c).     A process for monitoring and recording plant operations and metrics such influent flow, Secondary Treatment flow, effluent flow, concentration of mixed liquor suspended solids ("MLSS"), depth of sludge blanket levels and other appropriate criteria that the operations staff will use to determine the effective treatment capacity of the secondary system, which establishes when a Bypass will commence and will cease.

(d).     The use of available laboratory and on-line instrumentation data before making a decision to change process controls.

(e).     Identification of the staff positions that will be responsible for implementing the Process Control Program.

(f).     Identification of activities that Chattanooga shall undertake when conditions indicate a probable need to have a Bypass.  Such activities may include monitoring and/or adjusting clarifier sludge blankets, balancing flows to Secondary Treatment units, etc.

(g).     A process for evaluating the effectiveness of the controls and for making adjustments as necessary to meet the goals of the Process Controls Program.

(h).     An operations record keeping protocol which shall establish a system for accurately recording operations of the Moccasin Bend WWTP including its Bypass and effluent monitoring activities.  Such records shall include operator logs, activity reports,

-58-

performance reports, documentation of all Bypass events and a listing of the criteria that determined when a Bypass commenced and ceased.

(i).     Performance measures for ensuring that the controls being implemented are as effective as possible.

26.     <u>Green Infrastructure Plan</u>.  Within twenty-four (24) months after the Effective Date of the Consent Decree, Chattanooga shall submit to EPA and TDEC for approval a Green Infrastructure Program Plan (the "GI Plan") for the CSS.  For the purposes of this Consent Decree, "Green Infrastructure" shall mean the range of stormwater control measures that use plant/soil systems, permeable pavement, stormwater harvest and reuse, or native landscaping to store, infiltrate, and/or evapotranspirate stormwater and reduce flows to the sewer systems or to surface waters.  Green Infrastructure may include, but is not limited to, bio-retention, extended detention wetland areas, green roofs and permeable pavement.  Green Infrastructure practices also include control measures to harvest and reuse stormwater, such as rain barrels and cisterns.  The GI Plan shall include the following elements:

(a).     <u>Green Infrastructure Controls</u>.  The GI Plan shall identify specific Green Infrastructure control measures that store, infiltrate, or evapotranspirate precipitation and reduce wet weather flows into the CSS.  The GI Plan shall also identify maintenance requirements for the control measures identified.

(b).     <u>Comprehensive Land Use Policy</u>.  The GI Plan shall include the development of a Comprehensive Land Use Policy for land owned by Chattanooga that assesses the potential for Chattanooga, either on its own or in partnership with private parties

-59-

or other governmental agencies, to implement Green Infrastructure on property owned or operated by Chattanooga.

(c).    Green Infrastructure Community Assistance.  Chattanooga shall establish and describe in the Plan a public participation process that provides information about Green Infrastructure.

(d).    Implementation Schedule.  The GI Plan shall include a process for setting Green Infrastructure control measure priorities and expeditious implementation schedules.

27.    Schedule Reconsideration Based on Financial Circumstances.  The schedule for completion of any of the projects required by this Consent Decree may be extended if Chattanooga is able to demonstrate a need for such an extension by submitting a request in writing to EPA and TDEC, including a Financial Capability Analysis.  Any such extension shall constitute a material change to this Consent Decree for purposes of Section XXIV of this Consent Decree (Modification).  As more particularly set forth below, such Financial Capability Analysis must demonstrate that the expected per household cost of Chattanooga's compliance with this Consent Decree will cause Chattanooga's cost per household to exceed 2.5% of the Median Household Income ("MHI") for Chattanooga's entire service area, calculated using EPA's *Combined Sewer Overflows Guidance for Financial Capability Assessment and Schedule Development*, EPA 8320B-97-004, published February 1997, or the most current version of EPA's affordability guidance or regulation in effect at the time of such request (the "Financial Capability Assessment Guidance").

(a). The schedule extension request must be provided at the same time as the Financial Capability Analysis, and must include a demonstration, complete with supporting documentation, that:

i. The Residential Indicator, when calculated in accordance with the Financial Capability Assessment Guidance, as modified by the requirements of Subparagraph 27.(c). below and using the inputs described and defined in Subparagraph 27(c). below, and using a reasonable engineering estimate of the remaining costs of completing construction of the projects required by this Consent Decree expressed in the value of dollars during the year that Chattanooga submits the schedule extension request, exceeds 2.5%, or other applicable percentage contained in the Financial Capability Assessment Guidance;

ii. A description of each requirement and associated deadline in the approved schedule for which Chattanooga seeks an extension; and

iii. Each request for a deadline extension is as short as reasonably possible.

(b). To determine Chattanooga's MHI, Chattanooga shall use MHI data for the most recent year from either the Federal Census or American Community Survey ("ACS"), whichever is the most current at the time of the submittal of the request for extension. If the most current ACS data includes both a one (1)-year estimate and three (3)-year estimate of MHI, Chattanooga shall use the one (1)-year estimate to determine their MHI, although Chattanooga may also submit an MHI figure based on the three (3)-year estimate of MHI under the ACS.

(c).     To calculate and determine Chattanooga's Residential Indicator at the time a schedule extension request is submitted, Chattanooga shall use the following inputs:

i.     Current annual operation and maintenance expenses for the WCTS and WWTP calculated as total expenses, including depreciation, in Chattanooga's Comprehensive Annual Financial Report ("CAFR") for the most recent year, but only if Chattanooga's CAFR accurately states Chattanooga's operation and maintenance expenses.  If Chattanooga's CAFR for the most recent year either does not exist or does not accurately state its operation and maintenance expenses, Chattanooga shall calculate and determine this input with appropriate accounting records, including source documents, and submit to EPA and TDEC copies of the accounting records and source documents.

ii.     Current annual debt service for the WCTS and WWTP calculated as the total principal and interest payments on bonds and notes from the financing activities section of the cash flow statement in Chattanooga's CAFR for the most recent year, but only if it accurately reflects the principal and interest payments.  If Chattanooga's CAFR for the most recent year either does not exist or does not accurately reflect Chattanooga's principal and interest payments, Chattanooga shall calculate and determine this input with appropriate accounting records, including source documents, and shall submit to EPA and TDEC copies of the accounting records and source documents;

iii.     Reasonable documented engineering estimates projecting the increase in operation and maintenance expenses expected after completing construction of the projects required by the Consent Decree, expressed in value of dollars for the year during which Chattanooga submits the schedule extension request;

iv.     The annual capital costs based on the expected financing of a

reasonable, documented engineering estimate of the costs of completing construction of the

projects required by this Consent Decree expressed in the value of dollars during the year that

Chattanooga submit the schedule extension request.  To support Chattanooga's calculation of

this input, Chattanooga shall submit to EPA and TDEC an explanation of the basis for, and

calculation of, the annual cost estimate and the engineering estimates, accounting records, and

source documents on which Chattanooga relied to calculate this input;

v.     When calculating Chattanooga's residential share of wastewater

treatment costs in accordance with the Financial Capability Assessment Guidance,

Chattanooga shall use the most recent year of Federal Census or ACS data and billing data

regarding Chattanooga's customer base not reflected in such data.  Chattanooga also shall use

the same ratio between total wastewater flow and residential I/I that Chattanooga uses for rate

setting purposes, if any, to calculate the residential share of wastewater treatment costs; and

vi.     When calculating the total number of households in Chattanooga's

service area, Chattanooga shall count each single family house, and each unit in multi-family

housing structures such as apartment buildings and duplexes as one household, but shall not

count households that have onsite sewage disposal (septic) systems.  To the extent that

customers' billing data does not accurately reflect the number of units in multi-family housing

structures, Chattanooga shall use ACS and Federal Census data to more accurately estimate the

total number of households in Chattanooga's service area.

(d).     In addition to the calculation of the Residential Indicator as required in

Subparagraph 27.(c), Chattanooga may submit an additional calculation using alternative

inputs that Chattanooga contends produces a more accurate calculation of the Residential Indicator, provided such inputs are consistent with the Financial Capability Assessment Guidance.

(e).     If EPA denies in writing Chattanooga's request for an extension for completing any of the deadlines in an approved schedule under this Consent Decree, in whole or in part, or if more than ninety (90) Days elapses from the date that Chattanooga submits such a request for an extension, and Chattanooga has not either received from EPA a written denial or approval of Chattanooga's schedule extension request, then Chattanooga may pursue dispute resolution pursuant to Section XII of this Consent Decree (Dispute Resolution).

(f).     If Chattanooga invokes the dispute resolution procedures of Section XII of this Consent Decree (Dispute Resolution) for a denial of its request for a schedule extension, then Chattanooga's obligations pursuant to this Consent Decree shall not be extended, postponed, or otherwise affected in any way unless and until final resolution of the dispute so provides.

## VII.  CIVIL PENALTY

28.     Chattanooga shall pay the sum of $476,400 as a civil penalty in accordance with the provisions of Paragraphs 29 and 30.

29.     Within thirty (30) Days after the Effective Date of this Consent Decree, Chattanooga shall pay to the United States fifty percent (50%) of the civil penalty due ($238,200) by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Chattanooga, following lodging of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern

-64-

District of Tennessee*, 1110 Market Street, Suite 301, Chattanooga, Tennessee 37401, (423) 752-5140. At the time of payment, Chattanooga shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in <u>United States et al. v. City of Chattanooga</u>, and shall reference the civil action number and DOJ case number 90-5-1-1-10145, to the United States in accordance with Section XIV of this Consent Decree (Notices); by email to <u>acctsreceivable.CINWD@epa.gov;</u> and by mail to:

EPA Cincinnati Finance Office<br>
26 Martin Luther King Drive<br>
Cincinnati, Ohio 45268

In the event that full cash payment to the United States is not made within thirty (30) Days of the Date of Entry, Chattanooga shall pay to the United States interest on the balance due from the original due date to the date of payment, at the rate calculated pursuant to 28 U.S.C. § 1961.

30. Chattanooga shall make payment as directed by the State of fifty percent (50%) of the civil penalty due as follows: Chattanooga shall spend $238,200 on the State Project in accordance with, and as more particularly set forth in, <u>Appendix D</u> of this Consent Decree. TDEC has approved this payment as an appropriate State Project recognizing the value of the project and its potential to positively impact the local environment.

## VIII. <u>SUPPLEMENTAL ENVIRONMENTAL PROJECT</u>

31. Chattanooga shall satisfactorily implement and complete a Supplemental Environmental Project ("SEP") involving the restoration of a tributary of South Chickamauga Creek in accordance with this Section VIII and <u>Appendix E</u> of this Consent Decree.

Chattanooga may use contractors or consultants in planning and implementing the SEP. The SEP shall be completed in accordance with the schedule set forth in <u>Appendix E</u>.

32. With regard to the SEP, Chattanooga certifies the truth and accuracy of each of the following:

(a). That all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that Chattanooga in good faith estimates that the cost to implement the SEP is $800,000.

(b). That, as of the date of executing this Consent Decree, Chattanooga is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum.

(c). That Chattanooga is not a party to any open federal financial assistance transaction that is funding or could be used to fund the same activity as the SEP, and that there is no such open federal financial assistance transaction that is funding or could be used to fund the same activity as the SEP, nor has the same activity been described in an unsuccessful federal financial assistance transaction proposal submitted to EPA within two (2) years of the date of Chattanooga's execution of this Consent Decree (unless the project was barred from funding as statutorily ineligible). For purposes of this certification, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee, or other mechanism for providing federal financial assistance whose performance period has not yet expired.

(d).    That the SEP is not a project that Chattanooga was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree.

(e).    That Chattanooga has not received, and will not receive, credit for the SEP in any other enforcement action.

(f).    That Chattanooga will not receive any reimbursement for any portion of the SEP from any other person.

33.    <u>SEP Completion Report</u>.  Within thirty (30) Days after the date set for completion of the SEP as set forth in <u>Appendix E</u> of this Consent Decree, Chattanooga shall submit a SEP Completion Report to the EPA and TDEC for review and comment.  The SEP Completion Report shall contain all of the following information:

(a).    A detailed description of the SEP as implemented.

(b).    A description of any problems encountered in completing the SEP and the solutions thereto.

(c).    An itemized list of all eligible SEP costs expended.

(d).    Certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree.

(e).    A description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

34.    EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate Chattanooga's SEP Completion Report.

-67-

35.     After receiving the SEP Completion Report, EPA shall notify Chattanooga whether or not Chattanooga has satisfactorily completed the SEP.  If Chattanooga has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section X of this Consent Decree (Stipulated Penalties).

36.     Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XII of this Consent Decree (Dispute Resolution).

37.     Any public statement, oral or written, in print, film, or other media, made by Chattanooga making reference to the SEP under this Consent Decree shall include the following language:  "This project was undertaken in connection with the settlement of an enforcement action, United States et al. v. City of Chattanooga, taken on behalf of the U.S. Environmental Protection Agency under the Clean Water Act."

## IX.  REPORTING REQUIREMENTS

38.     Quarterly Reports.  Beginning thirty (30) Days after the first (1st) full three (3) Month period following the Effective Date of this Consent Decree, and thirty (30) Days after each subsequent three (3) Month period thereafter until termination of the Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment a Quarterly Report that shall include the date, time, location, source, estimated duration, estimated volume, receiving water (if any), and cause of all SSO Events, Bypasses at the Moccasin Bend WWTP, and discharges from CSO Outfalls occurring in the applicable three (3) Month period.  In reporting such data, Chattanooga shall provide the information in a tabulated electronic format (e.g., Excel spreadsheet) as it deems appropriate.  For purposes of this Section IX (Reporting Requirements),

-68-

a "SSO Event" shall mean the total time period a SSO(s) (as defined in Subparagraph 8.(nn). of this Consent Decree) occurs at the same location and due to the same causes(s).  For example, a collapsed pipe that results in a SSO on multiple days is a single SSO Event.

39.     <u>Semi-Annual and Annual Work Progress Reports</u>.  Beginning thirty (30) Days after the first (1st) full six (6)-Month period following the Effective Date of this Consent Decree, and thirty (30) Days after each subsequent six (6)-Month period until the twelfth (12th) report is submitted, Chattanooga shall submit to EPA and TDEC for review and comment a Semi-Annual Work Progress Report.  Beginning thirty (30) Days after the first (1st) full twelve (12)-Month period following the submittal of the twelfth (12th) Semi-Annual Work Progress Report until termination of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment an Annual Work Progress Report.  Each Semi-Annual and Annual Work Progress Report shall include, at a minimum:

(a).     A description of projects and activities completed and milestones achieved during the previous applicable six (6) or twelve (12)-Month period pursuant to the requirements of this Consent Decree, in Gantt chart or similar format, including a description of the status of compliance or non-compliance with the requirements of this Consent Decree and, if applicable, the reasons for non-compliance.  If any non-compliance cannot be fully explained at the time the report is due, Chattanooga shall include a statement to that effect in the report.  Chattanooga shall investigate to determine the cause of the non-compliance and then shall submit an amendment to the report, including a full explanation of the cause of the non-compliance, within thirty (30) Days after submission of the report.

-69-

(b).     A summary of significant projects and activities anticipated to be performed, and milestones anticipated to be achieved, in the successive applicable six (6) or twelve (12)-Month period to comply with the requirements of this Consent Decree, in Gantt chart or similar format.

(c).     Any additional information Chattanooga determines is appropriate to demonstrate that Chattanooga is implementing the remedial actions required under this Consent Decree in an adequate and timely manner.

40.     <u>Annual Reports</u>.  Beginning sixty (60) Days after the first (1st) full twelve (12)-Month period following the Effective Date, and sixty (60) Days after each subsequent twelve (12) Month-period until termination of this Consent Decree, Chattanooga shall submit to EPA and TDEC for review and comment an Annual Report.  Each Annual Report shall cover the most recent applicable twelve (12)-Month period and shall include a summary of the CMOM Programs implemented or modified pursuant to this Consent Decree, including a comparison of actual performance with any performance measures that have been established.  For the first (1st) five (5) Annual Reports only, Chattanooga shall include a trends analysis of the number, volume, duration, and cause of Chattanooga's SSO Events for a twenty-four (24)-Month rolling period updated to reflect the SSO Events that occurred during the previous twelve (12)-Month period. Beginning with the sixth (6th) Annual Report, Chattanooga shall include a trends analysis of the number, volume, duration, and cause of Chattanooga's SSO Events for a five (5)-year rolling period updated to reflect the SSO Events that occurred during the previous twelve (12)-Month period.  In reporting trends and other SSO data, Chattanooga shall provide the information in such format as it deems appropriate.

41.     Except as otherwise provided in the SORP or ERP, whenever any violation of this Consent Decree or any other event affecting Chattanooga's performance under this Consent Decree or its NPDES Permit may pose an immediate threat to the public health or welfare or the environment, Chattanooga shall notify EPA and TDEC orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Chattanooga first knew of the violation or event.

42.     All reports shall be submitted to the persons designated in Section XVI of this Consent Decree (Notices) for EPA and TDEC and shall be certified pursuant to Paragraph 17 of this Consent Decree.  The certification requirement in Paragraph 17 does not apply to emergency or similar notifications where compliance would be impractical.  In addition, a copy of all reports submitted pursuant to this Section (IX. Reporting Requirements) shall also be made available to the public in the PDR.

43.     Compliance with this Section does not relieve Chattanooga of any other reporting obligations required by the CWA, the TWQCA, or implementing regulations, or by any other Federal, state, or local law, regulation, permit, or other requirement, including the NPDES Permit.

44.     Notification to EPA or TDEC pursuant to this Section of an anticipated delay shall not by itself excuse the delay or otherwise satisfy the notification requirements set forth in Section XI (Force Majeure).

45.     Any information provided pursuant to this Consent Decree may be used by the United States and the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

-71-

# X. STIPULATED PENALTIES

46.     Chattanooga shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below, unless excused under Section XI (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

47.     If Chattanooga fails to pay the civil penalty required to be paid to the United States under Section VII of this Consent Decree (Civil Penalty) when due, Chattanooga shall pay a stipulated penalty of $1,000 per day for each day that the payment is late.

48.     The following stipulated penalties shall accrue for each violation identified below:

(a).     SSO Events Reaching Waters.  For each SSO Event discharging wastewater to waters of the United States occurring after the Effective Date of this Consent Decree, a stipulated penalty may be assessed as follows:

| If an SSO Event Occurs: | Penalty per SSO Event: |
|---|---|
| Within twenty-four (24) Months of the Effective Date | $350 |
| Between twenty-four (24) Months and sixty (60) Months of the Effective Date | $500 |
| After sixty (60) Months of the Effective Date for each SSO Event less than 250,000 gallons | $1,000 |
| After sixty (60) Months of the Effective Date for each SSO Event 250,000 gallons or more | $2,000 |

For purposes of this Subparagraph 48.(a), a "SSO Event" shall mean the total time period a SSO discharging wastewater to waters of the United States occurs at the same location and due to the same causes(s). For example, a collapsed pipe that results in a SSO discharging wastewater to waters of the United States or State on multiple days is a single SSO Event.

        (b).   <u>Failure to Timely Submit Deliverable</u>. For each day Chattanooga fails to Timely submit any Deliverable, a stipulated penalty for each such Deliverable may be assessed as follows:

| Period of Noncompliance: | Penalty Per Deliverable Per Day: |
|---|---|
| One (1) to fifteen (15) days | $350 |
| Sixteen (16) to thirty (30) days | $500 |
| Thirty-one (31) to sixty (60) days | $1,000 |
| More than sixty (60) days | $2,000 |

        (c).   <u>Failure to Comply with CAP</u>. Beginning twenty-five (25) Months after EPA approval of the CAP, for each authorization by Chattanooga of a new sewer service connection in the SSS, or additional flow from an existing sewer service connection in the SSS, not consistent with the requirements of the CAP, a stipulated penalty of $10,000 may be assessed.

        (d).   <u>Failure to Complete SSES Phase I and/or SSES Phase II</u>. For each day Chattanooga fails to Timely complete SSES Phase I and/or SSES Phase II in accordance with the final deadlines set forth in Subparagraph 21.(b)., daily stipulated penalties may be assessed as follows:

-73-

| Period of Noncompliance: | Penalty Per Day: |
|---|---|
| One (1) to thirty (30) days | $500 |
| Thirty-one (31) to sixty (60) days | $1,000 |
| Sixty-one (61) to one hundred-eighty (180) days | $2,500 |
| More than one hundred-eighty (180) days | $5,000 |

(e).     <u>Failure to Complete the East Bank/West Bank Outfall Assessment and Rehabilitation Plan</u>.  For each day Chattanooga fails to Timely complete the East Bank/West Bank Outfall Assessment and Rehabilitation Plan in accordance with the final deadline set forth in Paragraph 23, daily stipulated penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Day: |
|---|---|
| One (1) to thirty (30) days | $500 |
| Thirty-one (31) to sixty (60) days | $1,000 |
| Sixty-one (61) to one hundred-eighty (180) days | $2,500 |
| More than one hundred-eighty (180) days | $5,000 |

(f).     <u>Failure to Complete the Additional Operational Plan for Chattanooga Creek CSO Outfalls</u>.  For each day Chattanooga fails to Timely complete the Additional Operational Plan for Chattanooga Creek CSO Outfalls in accordance with the final deadline set forth in Subparagraph 24.(a)., daily stipulated penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Day: |
|---|---|
| One (1) to thirty (30) days | $500 |
| Thirty-one (31) to sixty (60) days | $1,000 |

| | |
|---|---|
| Sixty-one (61) to one hundred-eighty (180) days | $2,500 |
| More than one hundred-eighty (180) days | $5,000 |

(g).    <u>Failure to Complete Rehabilitation at the Moccasin Bend WWTP Pursuant to Feasible Alternative Analysis</u>.  For each day Chattanooga fails to Timely complete any identified rehabilitation projects at the Moccasin Bend WWTP pursuant to Feasible Alternative Analysis in accordance with the final deadline set forth in Subparagraph 24.(c)., daily stipulated penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Day: |
|---|---|
| One (1) to thirty (30) days | $500 |
| Thirty-one (31) to sixty (60) days | $1,000 |
| Sixty-one (61) to one hundred-eighty (180) days | $2,500 |
| More than one hundred-eighty (180) days | $5,000 |

(h).    <u>Failure to Complete the SEP</u>.  After receiving the SEP Completion Report, in the event EPA notifies Chattanooga that Chattanooga has failed to satisfactorily complete the SEP in accordance with the terms of this Consent Decree as described in Section VIII and <u>Appendix E</u> (including the allowable expenditures for the SEP), a stipulated penalty of $375,000 may be assessed if Chattanooga does not cure the deficiencies identified in EPA's notice within ninety (90) Days after receiving such notice.  Notwithstanding the foregoing, if EPA determines that Chattanooga has made good faith efforts to satisfactorily complete the SEP and has certified, with supporting documentation, that at least ninety (90) percent of the required amount of money has been spent on the SEP, Chattanooga shall not be liable for any stipulated penalty.

-75-

(i).    <u>Failure to Timely Implement State Project Milestones</u>.  For each Day Chattanooga fails to Timely implement a State Project milestone set forth in Appendix D, daily stipulated penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| One (1) to thirty (30) Days | $500 |
| Thirty-one (31) to sixty (60) Days | $1,500 |
| More than sixty (60) Days | $2,250 |

49.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

50.    Except for the stipulated penalty in Subparagraph 48.(i)., Chattanooga shall pay stipulated penalties within thirty (30) Days of a written demand by EPA.  For the stipulated penalty in Subparagraph 48.(i)., Chattanooga shall pay stipulated penalties within thirty (30) Days of a written demand by TDEC.  Except for the stipulated penalties in Subparagraphs 48.(a) and (i)., Chattanooga shall pay fifty (50) percent of the total stipulated penalty amount due to the United States and fifty (50) percent to the State.  For the stipulated penalty in Subparagraph 48.(a), Chattanooga shall pay one hundred (100) percent of the total stipulated penalty amount due to the United States.  For the stipulated penalty in Subparagraphs 48.(i)., Chattanooga shall pay one hundred (100) percent of the total stipulated penalty amount due to the State.

51.    Except for the stipulated penalty in Subparagraph 48.(i)., the United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due

-76-

under this Consent Decree. TDEC may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under Subparagraph 48.(i) of this Consent Decree.

52. Stipulated penalties shall continue to accrue as provided in Paragraph 49 during any Dispute Resolution, but need not be paid until the following:

(a). If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Chattanooga shall pay accrued penalties determined to be owing, together with interest, to the United States and the State within thirty (30) Days of the effective date of the agreement or the receipt of EPA's decision or order.

(b). If the dispute is appealed to the Court and the United States prevails in whole or in part, Chattanooga shall pay all accrued penalties determined by the Court to be owed, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph 52.(c). below.

(c). If the District Court's decision is appealed, Chattanooga shall pay all accrued penalties determined to be owed, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

53. Chattanooga shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 29, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. Chattanooga shall pay stipulated penalties owing to the State by check payable to the "State of Tennessee." Each check shall reference the case name and civil action number herein and shall be sent to:

Phillip Hilliard
Office of the Attorney General
Environmental Division
P.O. 20207
Nashville, Tennessee 37202

54.     If Chattanooga fails to pay stipulated penalties according to the terms of this Consent Decree, Chattanooga shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or the State from seeking any remedy otherwise provided by law for Chattanooga's failure to pay any stipulated penalties.

55.     Subject to the provisions of Section XIV of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States and the State for Chattanooga's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of the CWA and/or the TWQCA, Chattanooga shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

## XI.  FORCE MAJEURE

56.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Chattanooga, of any entity controlled by Chattanooga, or of Chattanooga's consultants and contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Chattanooga's best efforts to fulfill the obligation. The requirement that Chattanooga exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects

-78-

of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include Chattanooga's financial inability to perform any obligation under this Consent Decree.

57.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Chattanooga shall provide written notice to EPA and TDEC, within twenty-one (21) days from the date that Chattanooga first knew that the event might cause a delay. Such written notice shall include the following: an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Chattanooga's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Chattanooga, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Chattanooga shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event. Failure to comply with the above requirements shall preclude Chattanooga from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Chattanooga shall be deemed to know of any circumstance of which Chattanooga, any entity controlled by Chattanooga, or Chattanooga's contractors knew or should have known.

58.     If EPA, after a reasonable opportunity for review and comment by TDEC, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for

performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by TDEC, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Chattanooga in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

59. If EPA, after a reasonable opportunity for review and comment by TDEC, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Chattanooga in writing of its decision.

60. If Chattanooga elects to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice. In any such proceeding, Chattanooga shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Chattanooga complied with the requirements of Paragraphs 56 and 58 above. If Chattanooga carries this burden, the delay at issue shall be deemed not to be a violation by Chattanooga of the affected obligation of this Consent Decree identified to EPA and the Court.

## XII. **DISPUTE RESOLUTION**

61.     Unless otherwise expressly provided for in this Consent Decree, the dispute

resolution procedures of this Section shall be the exclusive mechanism to resolve disputes

arising under or with respect to this Consent Decree.  Chattanooga's failure to seek resolution of

a dispute under this Section shall preclude Chattanooga from raising any such issue as a defense

to an action by the United States or the State to enforce any obligation of Chattanooga arising

under this Consent Decree.

62.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be

considered to have arisen when Chattanooga sends the United States a written Notice of Dispute.

Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotia-

tions shall not exceed thirty (30) Days from the date the dispute arises, unless that period is

modified by written agreement between the United States and Chattanooga.  The United States

shall consult with the State and the TCWN during the period of informal negotiations.  If the

United States and Chattanooga cannot resolve a dispute by informal negotiations, then the

position advanced by the United States shall be considered binding unless, within forty-five (45)

Days after the conclusion of the informal negotiation period, Chattanooga invokes formal dispute

resolution procedures as set forth below.

63.     Formal Dispute Resolution.  Chattanooga shall invoke formal dispute resolution

procedures, within the time period provided in the preceding Paragraph, by serving on the United

States and the State a written Statement of Position regarding the matter in dispute.  The

Statement of Position shall include, but need not be limited to, any factual data, analysis, or

opinion supporting Chattanooga's position and any supporting documentation relied upon by

Chattanooga. The United States shall serve its Statement of Position within sixty (60) Days of receipt of Chattanooga's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States shall consult with the State and the TCWN during preparation of its Statement of Position. The United States' Statement of Position shall be binding on Chattanooga, unless Chattanooga files a motion for judicial review of the dispute in accordance with the following Paragraph.

64. <u>Judicial Dispute Resolution</u>. Chattanooga may seek judicial review of the dispute by filing with the Court and serving on the United States and the State, in accordance with Section XVI of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Chattanooga's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree. The United States shall respond to Chattanooga's motion within the time period allowed by the Local Rules of this Court ("Local Rules"). The United States shall consult with the State and the TCWN during preparation of its response. Chattanooga may file a reply memorandum, to the extent permitted by the Local Rules.

65. Except as otherwise provided in this Consent Decree, in any dispute brought before this Court that was invoked under Paragraph 64, Chattanooga shall bear the burden of

proof, and each Party reserves the right to argue what the appropriate standard of proof and standard of review should be under applicable principles of law.

66.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Chattanooga under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first (1st) day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 52.  If Chattanooga does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.  RIGHT OF ENTRY AND INFORMATION COLLECTION AND RETENTION

67.     The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

(a).     Monitor the progress of activities required under this Consent Decree;

(b).     Verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

(c).     Obtain samples and, upon request, splits of any samples taken by Chattanooga or its representatives, contractors, or consultants;

(d).     Obtain documentary evidence, including photographs and similar data; and

(e).     Assess Chattanooga's compliance with this Consent Decree.

-83-

68.     Upon request, Chattanooga shall provide EPA and TDEC or their authorized representatives splits of any samples taken by Chattanooga. Upon request, EPA and TDEC shall provide Chattanooga splits of any samples taken by EPA or TDEC.

69.     Until three (3) years after the termination of this Consent Decree, Chattanooga shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Chattanooga's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or the State, Chattanooga shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

70.     After the conclusion of the information-retention period provided in the preceding Paragraph, Chattanooga shall notify the United States and the State at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, Chattanooga shall deliver any such documents, records, or other information to EPA or TDEC. Chattanooga may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Chattanooga asserts such a privilege, it shall provide the following:

(a).     The title of the document, record, or information;

-84-

(b).     The date of the document, record, or information;

(c).     The name and title of each author of the document, record, or information;

(d).     The name and title of each addressee and recipient;

(e).     A description of the subject of the document, record, or information; and

(f).     The privilege asserted by Chattanooga.

However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

71.     Chattanooga may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Chattanooga seeks to protect as CBI, Chattanooga shall follow the procedures set forth in 40 C.F.R. Part 2.

72.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Chattanooga to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIV.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

73.     This Consent Decree resolves the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the Date of Lodging of this Consent Decree.

74.     This Consent Decree also resolves the civil claims of the TCWN for the violations alleged, or that could have been alleged, in the TCWN Complaint filed in this action through the

Date of Lodging of this Consent Decree. In addition, this Consent Decree resolves all civil claims of the TCWN for the penalties associated with any activity subject to a stipulated penalty under this Consent Decree.

75. The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 73. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the CWA, the TWQCA, or their implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 73. The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Chattanooga's Sewer System, whether related to the violations addressed in this Consent Decree or otherwise.

76. The TCWN reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 74. This Consent Decree shall not be construed to limit the rights of the TCWN to obtain penalties or injunctive relief under the CWA or its implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 74.

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to the Sewer System or Chattanooga's violations, Chattanooga shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that

-86-

the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 73 of this Section.

78.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Chattanooga is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Chattanooga's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Chattanooga's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, the TWQCA, or with any other provisions of federal, State, or local laws, regulations, or permits.

79.    This Consent Decree does not limit or affect the rights of any of the Parties against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Chattanooga, except as otherwise provided by law.

80.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV. COSTS

81.    The Parties shall bear their own costs of this action, including attorneys' fees, except as follows:

(a).     The United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Chattanooga.

(b).     Chattanooga agrees to pay TCWN's reasonably related attorney fees and expenses as detailed in the itemization provided to Chattanooga's attorneys by written correspondence dated March 19, 2012 (in the sum of $36,804.11).  TCWN and its attorneys will make no further claim for fees or expenses incurred in this action after the Date of Entry.

## XVI.  <u>NOTICES</u>

82.     Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>To the United States</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611

and

Chief, Clean Water Enforcement Branch
Water Protection Division
U.S Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA  30303
(404) 562-9776

<u>To EPA</u>:

Chief, Clean Water Enforcement Branch

Water Protection Division
U.S Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA  30303
(404) 562-9776

To the State:

Phillip Hilliard
Senior Counsel
Office of the Attorney General
Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202

and

Enforcement Coordinator, Water Pollution Control
Tennessee Department of Environment and Conservation
6th Floor, L&C Annex
401 Church Street
Nashville, Tennessee  37243-1534
(615) 532-0625

To TDEC:

Enforcement Coordinator, Water Pollution Control
Tennessee Department of Environment and Conservation
6th Floor, L&C Annex
401 Church Street
Nashville, Tennessee  37243-1534
(615) 532-0625

To Chattanooga:

Director, Public Works
City of Chattanooga, Tennessee
1250 Market St # 2100
Chattanooga, TN 37402
(423) 643-6000

Chattanooga City Attorney
City of Chattanooga, Tennessee

-89-

100 E. 11th Street, Suite 200
Chattanooga, TN  37402
(423) 643-8250

and

Adam G. Sowatzka
Baker Donelson
Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
(404) 443-6715

To TCWN:

Stephanie Durman Matheny
Tennessee Clean Water Network
P.O. Box 1521
Knoxville, Tennessee  37901

83.     Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

84      Notices submitted pursuant to this Section shall be deemed submitted upon

mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties

in writing.

## XVII.  EFFECTIVE DATE

85.     The Effective Date of this Consent Decree shall be the date upon which this

Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

whichever occurs first, as recorded on the Court's docket.

## XVIII.  RETENTION OF JURISDICTION

86.     The Court shall retain jurisdiction over this case until termination of this Consent

Decree for the purpose of resolving disputes arising under this Consent Decree or entering orders

modifying this Consent Decree, pursuant to Sections XII (Force Majeure) and XIV (Effect of Settlement/Reservation of Rights), or effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX.  MODIFICATION

87.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.  Non-material changes to this Consent Decree (including appendices) may be made by written agreement of the Parties without court approval, and the Parties may by mutual agreement determine whether a modification is non-material.

88.     Any disputes between the Parties concerning modification of this Consent Decree shall be resolved pursuant to Section XII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 65, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.  TERMINATION

89.     This Consent Decree may be terminated when the United States determines that Chattanooga has satisfactorily completed performance of its compliance (Section VI) and SEP (Section VIII) obligations required by this Consent Decree, provided that Chattanooga has fulfilled all other obligations of this Consent Decree, including payment of the civil penalty under Section VII of this Consent Decree and any accrued stipulated penalties as required by Section X of this Consent Decree not waived or reduced by the United States.  Chattanooga may

serve upon the United States a Request for Termination, certifying that Chattanooga has satisfied those requirements, together with all necessary supporting documentation.

90.     Following receipt by the United States of Chattanooga's Request for Termination, the United States and Chattanooga shall confer informally concerning the Request and any disagreement that they may have as to whether Chattanooga has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with the State and TCWN, agrees that this Consent Decree may be terminated, the United States and Chattanooga shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

91.     If the United States, after consultation with the State and TCWN, does not agree that this Consent Decree may be terminated, Chattanooga may invoke Dispute Resolution under Section XII of this Consent Decree. However, Chattanooga shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 63 of Section XII, until ninety (90) Days after service of its Request for Termination.

## XXI. **PUBLIC PARTICIPATION**

92.     This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Chattanooga, the State, and TCWN all consent to entry of this Consent Decree without further notice, and agree not to withdraw from, or oppose entry of, this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the

United States has notified the Parties in writing that it no longer supports entry of the Consent Decree.

## XXII.  SIGNATORIES/SERVICE

93.     Each undersigned representative of Chattanooga, EPA, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, TDEC, the State, and TCWN certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

94.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Chattanooga's agent on the signature page agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII.  INTEGRATION

95.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than Deliverables that are subsequently submitted and approved pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## XXIV. FINAL JUDGMENT

96.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, TCWN, and Chattanooga.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Rules 54 and 58 of the Federal Rules of Civil Procedure.

## XXV. APPENDICES

98.     The following appendices are attached to and part of this Consent Decree:

"Appendix A" is the map of Chattanooga's Sewersheds.

"Appendix B" is the CDROM disk containing EPA Region IV's MOM guidance.

"Appendix C" is the list and description of the Early Action Capital Improvement Projects.

"Appendix D" is the description of the State Project.

 "Appendix E" is the description of the Supplemental Environmental Project.

Dated and entered this <u>24th</u> day of <u>April</u>, <u>2013</u>.


**SO ORDERED.**

**ENTER:**

<u>**/s/**                                            </u>
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**